**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

**FILED**

DEC 2 8 2005

U. S. DISTRICT COURT
**EASTERN DISTRICT OF MO**
**ST. LOUIS**

GEORGE SIEPEL; PHYLLIS SIEPEL; )
H. CRAIG WILLIAMS; ELINOR TAMA )
WILLIAMS; CONSTANCE ELAINE )
WILLIAMS; DONNA N. REINKE; )
ROBERT COHEN; CARL M. PAGE )
and all others similarly situated,

**4 05CV02393CAS**

Case No.

Plaintiffs,

v.

JURY TRIAL DEMANDED

BANK OF AMERICA, N.A.; )
COLUMBIA FUNDS SERIES TRUST )
f/k/a/ NATIONS FUNDS TRUST; )
and BANK OF )
AMERICA CORPORATION, )

CLASS ACTION

Defendants. )

## COMPLAINT

COMES NOW plaintiffs George Siepel, Phyllis Siepel, H. Craig Williams, Elinor Tama

Williams, Constance Elaine Williams, Donna N. Reinke, Robert Cohen and Carl M. Page, on

behalf of themselves, and for all other members of the Class hereinafter described, by and

through counsel, seek damages from the defendants and injunctive relief and state and allege as

follows:

## BACKGROUND

1. Defendant Bank of America, N.A. (the "Bank") and its parent, defendant Bank of

America Corporation ("BAC") are multi-national behemoths which have acquired financial

institutions throughout the country, including, within this District, the former Boatmen's Trust

Company and its affiliated entities. In connection therewith, it engages in highly sophisticated

"asset gathering" pursuant to which it seeks to and does attract relatively wealthy people to its so-

called "Private Bank" the purposes of which are, *inter alia*, to seek such persons' designation of
the Bank as Trustee, Personal Representative of estates and other roles as a corporate fiduciary.

2.      In carrying out such "asset gathering," the Bank prominently and falsely
advertises its promise and holds itself out to persons such as plaintiffs and the members of the
Class who do business with its "Private Bank":

## BANK OF AMERICA [LOGO] HIGHER STANDARDS

### THE PRIVATE BANK

**Managing today's complex wealth.**

**Balancing growth, risk, taxes**

**and grandchildren.**

As your financial resources increase, perhaps you need more financial resources to manage them.
The Private Bank of Bank of America has greater depth and breadth of wealth management
expertise – across the financial spectrum – than any other private bank. Equally important, we
bring this expertise together, creating more integrated solutions to your complex needs. And we
provide these customized recommendations based on the extraordinary strength and stability of
Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than
150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex
wealth management needs. Our experienced advisors customize unique and comprehensive
solutions for each individual, integrating world-class investment management, trusts, credit and*

2

*bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.* [Emphasis in original].

3.     In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof), as described herein, those promises have been and are being uniformly ignored or deliberately broken. In the context of their numerous acquisitions of other financial institutions to create a nationwide "wealth management" business, Messrs. McColl, Hance and Lewis centralized the functions of the Acquired Banks into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" by Call Centers and as many of such accounts' assets into the Bank's proprietary mutual funds, the Nations Funds. In the course of carrying out their "master plan," they and their confederates at the helm of NFT sacrificed the interests of the beneficiaries of the affected fiduciary accounts in favor of the defendants' "bottom line" as described herein.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

4.     Over the course of the last 15 years, the Bank and BAC have made numerous acquisitions of other financial institutions throughout the United States, many of which acquisitions were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr. assisted by his subordinates, Kenneth Lewis, current Chairman and Chief Executive Officer and James H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be one of the largest financial service providers in the world."

5.     A press release issued by the Bank on July 28, 2000, shortly after it had put into operation a corporate-wide plan to eliminate many of the investment-related and other services to

3

beneficiaries of fiduciary accounts as described herein, explained, in part, how Messrs. McColl.

Lewis, Hance and their subordinates were going to carry out this plan, including the elimination

of those personnel who provided services to fiduciary account beneficiaries while at the same

time increasing the fees paid by them:

> As part of these initiatives, the company will eliminate between 9,000 and
> 10,000 positions mostly during the next 12 months, in order to reallocate
> resources. The principal focus of these reductions will be in middle and
> senior management and positions eliminated as a result of process
> improvements. These reductions will take place across the company's
> franchise. The company now employs about 150,000 people.
>
> "We have been saying for some time that our days of growth by merger
> and acquisition are behind us," said Chairman and Chief Executive Officer
> Hugh L. McColl, Jr. "For the most part, our merger transition work also is
> behind us. We have successfully built a company with unlimited potential.
> To date, despite our many successes in individual businesses, we have not
> made the degree of progress we would like toward realizing that potential.
> We've assembled the right parts, but after years of additions, our resulting
> structure is neither as efficient, nor as effective as it needs to be. We're
> going to fix it in order to take advantage of our revenue opportunities."
>
>       *   *   *
>
> Lewis also announced steps to boost productivity. First, he said, the
> company intends to eliminate management layers, giving top executives
> more direct responsibility for customer service. Second, it will overhaul
> processes and organizational structures to simplify and expedite banking
> transactions for customers and deliver financial solutions that lead to
> profitable relationships. These changes, which are still being designed,
> could affect everything from credit underwriting procedures to call center
> technology and are heavily weighted toward enhancing revenue growth.
>
>       *   *   *
>
> Vice Chairman and Chief Financial Officer James H. Hance, Jr. said the
> company plans to take a charge of $300-350 million after-tax in the third
> quarter, primarily to cover severance costs related to the initiatives
> announced today. Productivity gains are expected to pay for severance and
> other related costs in approximately one year. Hance added that a
> substantial portion of these savings will be earmarked for reinvestment.

6.     Mr. Hance also emphasized what the acquisitions of other financial institutions

was intended to accomplish for BAC and the Bank. In a November 19, 1998 speech in St. Louis,

he said:

> We also are diversifying our revenue stream away from dependence on
> gathering deposits and lending them and toward fee income. The latter is
> now about 40 percent of our total revenues, and our goal is to push fees to
> more than half of revenues in a short period of time.
>
> *     *     *
>
> The leverage as you increase the assets of a fund is significant.
>
> *     *     *
>
> **The most obvious advantage of scale is cost. Perhaps the best
> advantage is the exploding world of mutual funds. As the second
> largest player among banks, we have achieved significant scale. The
> leverage as you increase the assets of a fund is significant. After all,
> one money manager can manage $5 million or $50. So as you get
> bigger, you get much, much more profitable.**
> [Emphasis added]

7.     On April 17, 1998, the San Francisco Business Times noted with respect to the

acquisition/consolidation strategy of Mr. McColl:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl Jr. has
> finally realized his manifest destiny, a decade-long quest to build a coast-to-coast
> bank.
>
> *     *     *
>
> Those familiar with McColl's style can already see the early signs that the former
> Marine's typical acquisition strategy is under way. The folksy, Southern charm of
> McColl and his troops belies a finely tuned merger machine in which an acquired
> institution's culture and identity are efficiently blended into NationsBank. The
> Charlotte bank has digested more than 70 deals since 1980. With that level of
> experience, the bank is not likely to repeat the customer service problems that
> arose from another San  Francisco merger, Wells Fargo's purchase of First
> Interstate Bank."

8.    During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable- the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.
>
>        Mr. Lewis' explanation of how BAC and the Bank could squeeze
> "savings and efficiencies" from BAC's then most recent acquisition was
> reinforced in the business media several months later in April 2004 by
> David Pauly, writing for Bloomberg News:
>
> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp.-thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to managing
> the company's myriad acquisitions of the past.
>
> *    *    *
>
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. A lot of jobs will have to go to make up for the excessive
> payment.

## JURISDICTION AND VENUE

9.    This Class Action is brought by plaintiffs on their own behalf and on behalf of all

other members of the Class defined below, arising out of, *inter alia*, breaches of fiduciary and

contractual duties owed by the defendants Bank of America, N.A. (the "Bank"), the Bank's

parent, Bank of America Corporation ("BAC") and Columbia Funds Series Trust f/k/a Nations

Funds Trust ("NFT"), controlled by the Bank and BAC to certain beneficiaries of fiduciary

accounts for which the Bank serves and/or served as fiduciary. In addition, certain claims are

asserted by plaintiffs against the Bank on behalf of Sub-Classes as defined below. Unless the

6

context indicates otherwise, the term "Class" includes members of the Sub-Classes and their respective representatives.

10.     The substantive claims asserted herein arise under and pursuant to state statutes and common law.

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1711, the Class Action Fairness Act of 2005, and 28 U.S.C. § 1367. The amount in controversy exceeds $5,000,000 exclusive of interest and costs and there is diversity of citizenship between and each of the defendants. Significant conduct of the defendants as described herein occurred within the State of Missouri and the Eastern District of Missouri, the principal office of the so-called "Private Bank" of defendant Bank. Further, each of the defendants presently conducts and/or has conducted business within and/or can be found and/or conducted significant business operations within this District during the time period of the wrongdoing alleged herein. Each of the defendants had continuous and systemic contacts with this District by reason of, *inter alia*, their common scheme, plan and conspiracy set forth below, to foist upon the fiduciary accounts of plaintiff and all members of the Class shares of the proprietary mutual funds of defendants including, in particular, those of defendant NFT, which funds were known as "Nations Funds" and are presently in the process of being re-named "Columbia Funds". Accordingly, this Court has personal jurisdiction over the defendants pursuant to §506.500 R.S.Mo.

12.     Venue is proper in this District as many of the acts and practices complained of herein had their origin in and/or occurred in substantial part in this District. Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. Plaintiff Cohen resides in

this District, as do large numbers of the members of the Class. In addition, a substantial amount of documents relevant to this dispute are located in this District. Further, pending in this District is *Kutten et al v. Bank of America, et al*, Case No. 4:04-cv-244 ("*Kutten* case") in which many of the claims of the Class herein have previously been asserted and are presently pending.

13.     In connection with the acts alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets. Each of the defendants, directly and/or through agents, affiliates and/or independent contractors distributed Nations Funds prospectuses within and otherwise marketed Nations Funds shares to members of the Class residing in this District, all of which conduct originated within and or outside the State of Missouri.

## THE PARTIES

14     (a)     Plaintiff Donna N. Reinke is a citizen of the State of Washington and is a beneficiary of the Estate of Margaret Spencer, who died on September 11, 2001. ("Spencer Estate" or the "Estate") The Bank, together with two individuals, Neil MacKinnon and William Morris, were the Co-Executors of the Spencer Estate, the assets of which were invested until December 2003, when the remaining cash was distributed to plaintiff Reinke and the other beneficiaries of the Estate. Although the physical administration of the Estate was carried out in the State of Washington and it was probated by a Washington probate court (the Superior Court), the weight of the conduct giving rise to plaintiff Reinke's claims as asserted herein; i.e. the appropriateness of investing fiduciary assets in shares of the Bank's proprietary mutual funds, was in this District, which was the focal point for the wrongdoing alleged herein. Although plaintiff Reinke signed a Receipt and Waiver of Notice of Filing Declaration of Completion of

8

Probate on March 6, 2004, she was induced to do so by the filing of a false and misleading

Declaration of Completion of Probate which, *inter alia*, concealed from plaintiff Reinke and the

Superior Court that the Bank, as Personal Representative, had engaged in self-dealing; that it had

purchased shares of the Nations Funds knowing that alternative investments could have been

purchased for the Estate with higher investment yields with comparable safety; that the

prospectuses distributed to plaintiff Reinke in connection with the Nations Funds were false and

misleading in material respects as set forth below and did not adequately disclose to her "the true

direct and indirect expenses charged by Nations Funds"; that the *Kutten* case had been

commenced, as had other claims been asserted by other beneficiaries of the Bank's fiduciary

accounts; and certain of the other facts set forth below which had impacted negatively upon the

assets in the Spencer Estate account. Thus, plaintiff Reinke's acknowledged receipt of "all to

which she is entitled from the Personal Representative" was induced fraudulently. As such, the

discharge of the Personal Representatives is and was a nullity, as were all other similar releases

and discharges obtained by the bank from beneficiaries of fiduciary accounts.

(b)     Plaintiff Robert Cohen is a citizen of the State of Missouri and is a

beneficiary of an Individual Retirement Account (the "IRA") over which account the Bank has

investment authority as a corporate fiduciary.

(c)     Plaintiffs H.Craig, Elinor Tama and Constance Elaine Williams (the

"Williams Plaintiffs") are citizens of the States of Florida and Pennsylvania and are siblings who

were beneficiaries of trusts set up by their father, Heberton F. Williams ("H.F.Williams")

pursuant to the terms of the Last Will and Testament of H.F.Williams. The Bank, as the

successor-in-interest to the original Trustee, was the principal Trustee of the Trusts established

pursuant thereto (the "Williams Trusts"). The original Trustee bank was First National Bank and

9

Trust Company of Jupiter/Tequesta which, in turn, was acquired by and merged into First Marine Bank & Trust Company which, in turn, was acquired by and merged into Barnett Banks Trust Company, N.A. which, in turn, was acquired by and merged into Nations Bank, N.A., now known as Bank of America, N.A. following the acquisition of Bank of America National Association by and merger into Nations Bank, N.A. At the outset, H.F. Williams wife, Jean, was the Co-Trustee with the Bank. The Williams Plaintiffs commenced a class action against the Bank and BAC in the Circuit Court of Palm Beach County in December 2002, Case Number 02-15454. BAC was dismissed as a defendant by the Court therein and such dismissal is the subject of an appeal. As such, the Williams Plaintiffs do not assert claims against BAC in this action. The remaining claims against the Bank were voluntarily dismissed by the Williams Plaintiffs in November 2005.

(d)     Plaintiffs George and Phyllis Siepel are citizens of the State of Illinois who are beneficiaries of the William J. Benstein and Agnes V. Benstein Residuary Trust ("Benstein Trust"), an Iowa trust of which United Central Bank of Des Moines, N.A., a corporate predecessor of the Bank, was Trustee.

(e)     Plaintiff Carl M. Page is a citizen of the State of Oregon who is a beneficiary of the Janet P. Wilson Trust, a New Mexico trust of which the Bank is Trustee through a Call Center.

15.     Defendant BAC is a Delaware holding company which owns the shares of numerous subsidiaries including those of defendant Bank which, over the last decade, has acquired numerous other banks and financial institutions and merged them into it at the direction of, *inter alia*, their respective Chief Executive Officers, Hugh McColl, Jr. and Kenneth Lewis. Although the Bank and BAC now have their principal places of business in Charlotte, NC, they

10

do conduct substantial business within this District in many locations through the Bank's "Private Bank" and through other business operations.

16. Defendant NFT, is a Delaware statutory trust and is a controlled affiliate of the other defendants. Defendant NFT is nominally controlled by a Board of Trustees pursuant to Delaware statutory law and the provisions of the Investment Company Act of 1940. According to defendant NFT, it is governed by a Board of Trustees, a majority of which have nominally been "dis-interested" and elected by its shareholders and/or appointed by the very same Board of Trustees who have effectively "marched" to the Bank's orders. Additionally, defendant NFT states that the "shareholders of [NFT] are the various persons and entities that own the shares of the mutual funds in the Nations Funds family"; i.e. the fiduciary accounts which are or were the subject of this litigation and the beneficiaries thereof, plaintiffs and members of the Class, among others. Notwithstanding their beneficial ownership of the shares which would otherwise control the election of defendant NFT's Board of Trustees, upon information and belief, the Bank has taken for itself such voting rights and uses them to, *inter alia*, retain its domination and control over defendant NFT, the identity of its Board of Trustees (including the nominally independent members thereof), the selection of investment advisors to the Nations Funds, the Nations Funds themselves and otherwise. The Bank, upon information and belief, either holds in its capacity as a fiduciary or otherwise, sufficient numbers of the shares of the various Nations Funds that it is a "control person" of the NFT as such term is defined under the federal securities laws. The complete domination of NFT and the Nations Funds themselves is so pervasive that as a Vice President of the Bank, Ted Scharch, in defining the relationship between the Bank and the Nations Funds, claimed that the Bank owns the Nations Funds, a perception believed to be common among employees of the Bank. Such "ownership" also includes operating the Nations

11

Funds for the benefit of certain corporate and business customers of BAC and the Bank and
putting the relations with such customers (and the profits derived therefrom) before the interests
of plaintiffs and members of the Class. NFT conducts business within this District by means of,
*inter alia*, its distribution of prospectuses and other offering materials of the Nations Funds
family of mutual funds through the Bank and its subsidiaries and sister companies, its marketing
and sale of shares of such funds, primarily distributed by and through the Bank, BAC and/or their
subsidiaries, agents and independent contractors. Upon information and belief, NFT has also
maintained an office within this District during the time period relevant to this litigation. As
reported in the March 19, 2004 issue of the Charlotte Business Journal, "Bank of America Corp.
will close its St. Louis Nations Funds office....shutting an operation that once had 30 analysts
and mutual fund managers. The decision to disband the office and consolidate Nations Funds
personnel in New York was made last summer, and the remaining handful of staffers in St. Louis
will be given severance packages..." As such, defendant NFT maintained long-standing contacts
with and a continuous presence in this District and uniformly entered into contracts with
subsidiaries and affiliates of each of the other defendants to provide advisory and other services
for the Nations Funds, of which contracts plaintiffs are third-party beneficiaries.

17. At all relevant times, the investment decisions of the Spencer Estate were made by
the Bank or entities controlled by its parent, BAC or subsidiaries or affiliates thereof. All
references herein to the Nations Funds also include, to the extent the defendants have changed
the Funds' names, to Columbia Funds. Although certain ministerial activities were carried out in
connection with the Spencer Estate by Messrs. MacKinnon and Morris, all policy decisions
relating to the subject matter of this litigation, including the investments of the assets of the
Spencer Estate in the Nations Funds, were made at the corporate level by the defendants, which

12

decisions originated with the Bank's "Private Bank" and otherwise in St. Louis and in Charlotte, NC, the corporate headquarters of the Bank and BAC. Similarly, the investment decisions by the Bank with respect to the Nations Funds purchased for plaintiff Cohen's IRA, for the Williams Trusts, the Wilson Trust and the Benstein Trust were principally made or directed from St. Louis and Charlotte, notwithstanding any local contacts that might have existed. The handling of the assets of the accounts of the Spencer Estate, the IRA account and the accounts for the Williams, Wilson and Benstein Trusts by the Bank has not been materially different from its handling of the other fiduciary accounts over which the Bank was and/or is serving as corporate fiduciary with respect to its investment of fiduciary assets as described in this Complaint.

18. Defendant NFT is the holding/operating entity BAC formed to conduct business as the Nations Funds, with its principal place of business at One Bank of America Plaza, Charlotte, NC. Although nominally independent and supervised by its Board of Trustees, defendant NFT has at all relevant times been operated as an *alter ego* of defendants and their respective subsidiaries. Upon information and belief, all the members of the Board of Trustees of NFT were selected and/or approved by the other defendants and their respective subsidiaries. Until recently, in connection with the settlement of certain claims brought against the Bank and its subsidiaries by the Securities & Exchange Commission, no outsider had any role whatsoever in the selection and re-election of NFT's Trustees other than the Bank, BAC and their senior officers. As such, the Bank and BAC controlled NFT and the Nations Funds operated by it. The Nations Funds and other funds controlled by the defendants are generally referred to in the financial community as the Bank's proprietary funds and, even within the Bank, its executives refer to the Nations Funds as "owned" by the Bank.

13

19. Defendant BAC (through its subsidiaries) and other business entities not owned by defendant BAC individually and collectively, charge substantial fees and expenses to the Nations Funds and other proprietary mutual funds for their purported services which, together with NFT's own operating expenses, have had a substantial cost to plaintiff Reinke (through her share of the Estate), plaintiff Cohen (through his IRA account), the Siepels, plaintiff Page and the Williams Plaintiffs (through their respective Trusts) and to other members of the Class where fiduciary assets have been invested in one or more of the Bank's proprietary mutual funds including, in particular, the Bank's proprietary "money market" funds which, according to the Bank's Vice President and Portfolio Manager, Darcy Johnson, who testified in the *Kutten* case, have expense ratios which are "at least double" those of Vanguard Money Market Funds. The Bank has informed its Trust Officers and Portfolio Managers that "the use of outside mutual funds in fiduciary accounts is in violation of [its] corporate investment policy" and, as set forth below, it takes steps to coerce Portfolio Managers not to violate such policy.

## THE NATIONS FUNDS

20. NFT holds a "family" of many mutual fund portfolios (which, when re-named Columbia Funds following the merger of certain of such Funds with and into Nations Funds will number more than 100), which are proprietary funds nominally operated by NFT and its Board of Trustees. They are, in fact, as indicated above, directed and controlled by BAC and its subsidiaries, as are others of the defendants' proprietary funds (e.g. Marsico Funds). In addition to being an entity controlled by the other defendants, defendant NFT and its Board of Trustees had actual and/or constructive knowledge of the circumstances of the wrongdoing committed by the other defendants including, in particular, using the fiduciary assets of plaintiffs and the

14

members of the Class to bulk up the Bank's proprietary mutual funds for improper purposes as set forth herein. The acceptance of the fiduciary funds of plaintiffs and members of the Class to purchase shares of the Nations Funds under the circumstances described herein amounted to an acceptance by defendant NFT and each of its Trustees of those assets subject to the pre-existing fiduciary relationship between the Bank and the beneficiaries of such funds. Given the intertwined relationship among the defendants with respect to the investment of the assets of the fiduciary accounts of plaintiffs and the Class, the knowledge of each of them as to how and why the fiduciary funds were being invested (including the Bank's improper motives) each defendant, including NFT, was and/or is a fiduciary and/or acted in furtherance of the Bank's fiduciary responsibilities and, thus, aided and abetted the Bank in the commission of the wrongdoing alleged herein. Defendant NFT and each member of its Board of Trustees including, in particular, William P. Carmichael, William H. Craig, Thomas F. Keller, Carl E. Mundy, Jr., Cornelius J. Pings, Minor M. Shaw, Charles B. Walker, Edmund L. Benson, James B. Sommers and Thomas S. Word, Jr.(each of whom designated his mailing address at the headquarters of BAC and the Bank and few, if any, was capable of fulfilling his fiduciary responsibilities due to non-NFT obligations and otherwise) knew or should have known that they were assisting the Bank in breaching its fiduciary duties to plaintiffs and the members of the Class. At times relevant herein, in conspiracy with the Bank and BAC, subsidiaries of such defendants were selected and/or retained by NFT and its Board of Trustees, each of whom purported to "oversee" at least 78 (now more than 100) separate mutual funds, as advisors to the various Nations Funds on a "no-bid" basis. Additional subsidiaries of the Bank and/or BAC were also selected and/or retained on a "no-bid" basis to provide administrative services to the Nations Funds. As such, given the practical impossibility of actually "overseeing" the Nations Funds consistent with their fiduciary

15

duties, NFT's Trustees permitted the advisory fees and other expenses charged to the various Nations Funds to be established and maintained by NFT at artificially high levels, all of which was to the disadvantage of the holders of shares of the various Nations Funds, including the fiduciary accounts of the Spencer Estate and the IRA, of which plaintiffs Reinke and Cohen were beneficiaries, respectively, as well as the beneficiaries of the Benstein, Wilson and Williams Trusts. In furtherance of such conspiracy with the other defendants, at no time have NFT or its Trustees sought investment advisors or providers of services to the Nations Funds other than subsidiaries of the Bank and BAC, other than in certain specialized areas, where sub-advisors were retained or where otherwise necessary, thus unnecessarily increasing the operating expenses of the affected Nations Funds. By acting as described herein, NFT and its Trustees aided and abetted the Bank in the breach of its fiduciary duties to the members of the Class, which NFT and its legal counsel facilitated by generating deceptive Nations Funds prospectuses and other "disclosure documents" which concealed material facts with respect to the Conversions and otherwise. Such material facts were concealed from, *inter alia*, the beneficiaries and co-fiduciaries of the affected fiduciary accounts, as well as the Comptroller of the Currency, which cautioned BAC to carry out the Conversions consistent with the Bank's fiduciary obligations and the Securities and Exchange Commission, which had it been informed of the Bank's misrepresentations and omissions of material facts in connection with the sale of Nations Funds shares, would not have permitted the Conversions to take place.

21.     The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves.

16

22. Certain of such Nations Funds were funded by the Bank, in substantial part, or "bulked up," by transferring fiduciary assets in its control pursuant to the Conversions or otherwise to one or more of the defendants' proprietary funds described herein. Such funding permitted the affected Nations Funds and other proprietary funds to have substantial asset bases, an important selling point to the defendants in marketing shares in the Nations Funds to potential retail purchasers thereof through the Bank, other subsidiaries of BAC and/or through other marketing channels. The Nations Funds selected for investment of fiduciary assets by the Bank were intended , in many cases, to "mirror" the categories of assets held in the Bank's fiduciary accounts prior to the Conversion of fiduciary assets held in other forms, including assets held in the Bank's Common Trust Funds and/or which were individually invested, when possible. The Spencer Estate, at the time of Ms. Spencer's death in 2001, included municipal bonds paying tax-free interest at an approximately 4% rate, corporate bonds paying interest at an approximately 5% rate and other fixed income instruments paying at a 5-6% interest rate. As to plaintiff Cohen, prior to the Conversion, the assets in the IRA were invested principally in diversified securities and then converted into shares of various Nations Funds. Substantially similar or identical Conversions were carried out by the defendants with respect to the Benstein, Wilson and Williams Trusts and the fiduciary assets in which all members of the Class had interests. Most of such assets not already in the defendants' proprietary mutual funds were liquidated immediately prior to the various Conversions carried out by the Bank around the country, either as part of so-called "Common Trust Funds" or in individually-managed accounts, such as that of the Estate. However, the over-riding objective of the defendants was the transfer of fiduciary assets, in whatever form, into shares of the Nations Funds or others of the Bank's proprietary funds. As to those fiduciary accounts of the Bank not subject to the Conversions, the Bank nevertheless made

17

and continued to make investments of the assets in those accounts in Nations Funds Money Market and other Nations Funds.

23.     Historically, the Bank and its predecessors invested the assets comprising the Spencer Estate, the IRA, the Williams, Wilson and Benstein Trusts and those of members of the Class primarily through individually managed portfolios or through so-called "Common Trust Funds," as well as stocks, bonds and other assets. In addition, some of the Bank's fiduciary accounts held interests in real estate (as did the Spencer Estate), businesses and other assets which were also "converted" into shares of the various Nations Funds and other proprietary mutual funds. The cost of providing investment and related administrative services to the Bank's fiduciary accounts, pre-Conversion into proprietary mutual funds, was absorbed substantially by the Bank out of the fees it charged for serving as a fiduciary. Beginning some time prior to 1998, in order to, *inter alia,* generate incremental profits from its fiduciary operations and due to massive losses it had incurred from its traditional lending business and to generate savings to justify BAC's acquisition of other financial institutions as referred to above, the Bank and its predecessors, the Acquired Banks, developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profit from this aspect of their business. BAC's plan included the consolidation and elimination of the previously existing trust departments of the Bank, including the Acquired Banks, with the objective of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel, typically through "Call Centers" operated by the "Private Bank" of the Bank staffed, for the most part, by fungible functionaries, the principal function of which was to retain fiduciary assets within the Bank and to pacify or otherwise "stroke" complaining beneficiaries of those accounts. Pursuant to such business plans, the Bank and BAC decided to

18

utilize the assets within their control, including funds held by the Bank in fiduciary accounts, to fund a group of mutual funds (some newly formed with no operating history) and/or to add assets to such funds controlled by the defendants. These mutual funds included the Nations Funds as well as other mutual funds merged into them (including the Columbia Funds) which had been previously controlled by the Acquired Banks and other proprietary mutual funds (e.g. the Marsico Funds). Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, BAC, the Bank and their senior officers determined that a substantial portion of the assets of the fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks), such as the accounts of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts, would be converted into shares of certain members of the "family" of Nations Funds, the management and investment decisions of which were controlled by subsidiaries of BAC and by the Bank and/or into shares of other proprietary mutual funds controlled by them (the "Conversions"). Upon information and belief, the Conversions were carried out with the direct participation or supervision of the senior-most officers of the Bank and BAC including, *inter alia*, David W. Fisher, former President of the Private Bank and former Chief Executive Officers, Hugh McColl and Kenneth Lewis, who conceived of such Conversions as a means by which additional revenues could be obtained for the Bank while, simultaneously, closing down or sharply curtailing the trust departments of Acquired Banks and eliminating the employees therein and replacing them with "Call Centers" which "economies" were mandated by, *inter alia*, the acquisitions of the Acquired Banks and the prices paid for them as referred to above. Neither the Bank's Trust Officers, Portfolio Managers or the ultimate beneficiaries of the affected fiduciary

19

accounts had any practical choice but to accept the Conversions that were forced upon them.

Darcy Johnson, raised the following question with her superiors with respect to the Conversions:

> "Why is this conversion happening? We have an efficient vehicle
> [Common Trust Funds] that doesn't have fees in it, and now we're moving
> to an efficient vehicle that does have fees."
>
> In response, her superiors at the Bank told her "that [the] train left the
> station. It's [the Conversion] going to happen" which she took to mean:
> "Don't bother complaining or discussing it, because it's—yes, there are no
> choices. The decision had been made."

24.     Through a complicated and barely comprehensible grouping of advisors, sub-

advisors, subsidiaries and other affiliated and unaffiliated service providers, and without due

regard to the conflicts of interest of the defendants, the defendants engineered a scheme to benefit

themselves.

25.     Pursuant to this self-dealing scheme, the Bank effectively co-mingled its fiduciary

functions with the other business activities of both the Bank and BAC as well as with the Nations

Funds and thereby abdicated many of its traditional fiduciary responsibilities, functions and

services to beneficiaries of fiduciary accounts. By "crossing the line" in this manner, the Bank's

actions resulted in making investments for these accounts that resulted in higher total direct and

indirect expense charges to the fiduciary accounts as compared to the trustee or similar fees

historically paid to the Bank for, *inter alia,* active management of the fiduciary accounts' assets.

Additionally, the Nations Funds typically generated lower net investment returns than other

directly comparable mutual funds available to the Bank, including those offered by, *inter alia*,

the Vanguard Group and Fidelity Investments. Indeed, the Nations Funds money market funds

even generated lower investment returns than the Bank paid on deposits of cash to customers

who walked in off the street for whom the Bank was not in a fiduciary relationship.

20

26. Beginning in February 2000 or earlier and continuing for some time thereafter, the

Bank's "Private Bank" began sending out standardized form letters informing some co-

fiduciaries, beneficiaries of fiduciary accounts and others of the Bank's planned closing of its

"Common Trust Funds" and/or otherwise touting the so-called "benefits" of the Conversions,

which were then anticipated to take place on a rolling basis pursuant to carefully orchestrated

nationwide plans based, in part, upon the level of integration of the previously Acquired Banks

and other factors. Such letters, signed by David W. Fisher, then President of the Private Bank,

also coerced the recipients of the letter to authorize the Conversion of the fiduciary account

assets into shares in the Nations Funds. In particular, the Bank's letter said:[1]

> Using Nations Funds, we can provide trust and
> fiduciary accounts with an attractive mix of
> investments to pursue the accounts' investment goals.
> Nations Funds also offer the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification
> > Flexibility when making trust distributions

27. In fact, there was little, if any, material substantive benefit to fiduciary account

beneficiaries from the Conversions that could not have been accomplished more efficiently and

at lower cost to the fiduciary accounts by other alternatives including by maintaining the *status*

*quo.*

28. Indeed, the more significant of such so-called "benefits," could have been

accomplished by means of the Bank's "Common Trust Funds," investment of fiduciary assets in

---

[1] It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts or, in the case of guardianships, the Bank's serving as Executor/Personal Representative of estates and with respect to similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-trustees and co-executors received such a letter nor were their consents sought by the Bank. While the manner in which the Conversions were carried out by defendants may have been different from state-to-state and/or based upon the identity of the Acquired Bank, such differences were immaterial.

21

non-proprietary mutual funds and management of other assets. In fact, in furtherance of their objective of benefiting itself and BAC at the expense of plaintiffs and the members of the Class, the Bank made no significant, if any, effort to compare the expenses of operating the Nations Funds and other proprietary funds as compared to the thousands of other mutual funds in the marketplace which could have better served plaintiffs and the members of the Class, particularly those with better expense ratios and records of performance.

29. Similarly, the Bank made no effort to compare the management and historical performance of each of the Nations Funds and other proprietary funds with other available funds and fund advisors. Indeed, certain of the Nations Funds, at the time of the Conversions, were newly-formed and had no "track record." Thus, if the Bank was truly interested in obtaining for beneficiaries of fiduciary accounts the "benefits" it claimed to exist, or real benefits, it could have obtained them elsewhere on terms much more favorable to the fiduciary accounts within their control. With respect to those accounts so invested, the Bank could also have obtained most of such benefits by maintaining the *status quo* with its Common Trust Funds and/or individual investments. Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds were to be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis, which was one of the claimed benefits of the Conversions. The Bank's letter went on to threaten coercively those who received it:

> Any common trust fund units for which we
> have not received an authorization [by May 1, 2000]
> may be liquidated and the proceeds placed in a money
> market vehicle pending discussion about
> reinvestment. This liquidation could have adverse tax
> consequences depending upon the cost basis of the
> common trust fund units.

22

30. In response to such coercion and the deceptive and unclear information provided by the Bank, upon information and belief, co-fiduciaries and beneficiaries of the fiduciary accounts and others who received it signed the enclosed form, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversions. Additionally, the Bank established a systematic program pursuant to which Trust Officers (typically Senior Vice Presidents and Vice Presidents) and others were induced to present the same coercive message to beneficiaries of fiduciary accounts who did not provide consents to the Bank with respect to the Conversion. At no time did such employees' oral presentations differ in any material substantive way from the "disclosure documents" (i.e. Nations Funds prospectuses, form letters from Mr. Fisher and uniform data sheets purporting to disclose the expenses of owning the various Nations Funds).

31. Enclosed with Mr. Fisher's form letters sent to, *inter alia*, some beneficiaries of fiduciary accounts, co-fiduciaries, administrators of employee benefit plans and/or managers of foundations were various prospectuses and other documents which were drafted so as to conceal the motives of the Bank and BAC for the Conversions into the defendants' proprietary mutual funds, the benefits of the Conversions to them and their subsidiaries or the increased costs and expenses that would be incurred by the fiduciary accounts as a result of the Conversions. There was no explanation in plain English that would put the recipients of these documents on notice of the Bank's wrongdoing as referred to herein. In fact, the Bank and the lawyers who drafted these documents, including NFT's counsel and in-house counsel for BAC and its subsidiaries, used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were

23

insufficient to overcome the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed. For example, with respect to the Spencer Estate, the Bank now admits that although it provided a "credit" of .30% (30 basis points) toward the fees it charged for serving as a fiduciary of the Estate, it calculated the advisory fees charged against the Nations Money Market Funds .37% (37 basis points) based upon the highest balance so invested, aside from all the other operating expenses such Nations Funds absorbed and which were passed along to the Spencer Estate in terms of lower investment yields. Further, in many other cases, there was no credit for the fiduciary fees charged by the Bank. Despite the outward appearance of independence of NFT and its legal counsel, who may have performed or been involved with the physical tasks of "drafting" them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank and their subsidiaries. Among other material facts these counsel concealed and thus excluded from the Nations Funds prospectuses was the fact that the various fees and expenses of the Nations Funds were determined unilaterally by BAC and/or its subsidiaries and the agreements with them were "no bid" and without any effort to determine whether these BAC subsidiaries were the most appropriate advisors or suppliers of other services to the Nation Funds or how their respective fees and other charges were determined. Indeed, with respect to the prospectuses used by the defendants for the Conversions, Robert Hitpas, a Senior Vice President of the Bank, as well as one who was responsible for overseeing numerous of the Bank's fiduciary accounts, testified in the *Kutten* case that he found them daunting, "full of legalese and fine print and they're very difficult to read."

24

32. Apparently as a result of an agreement among the defendants, there was no credit against the fees charged by the Bank to its fiduciary accounts for the substantial operating expenses of the Nations Funds, which substantially reduced the net investment returns to fiduciary accounts, such as the account of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts. At no place in any of the prospectuses the defendants issued to beneficiaries of fiduciary accounts in connection with the Conversions did they disclose that all fiduciary accounts affected by the Conversions would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing for whatever credits the Bank applied to its fees for serving as fiduciary. Indeed, upon information and belief, including information provided by one of the Bank's Trust Officers to a member of the Class, most of such credits, to the extent given, have now been substantially reduced.

33. Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversion they were being asked to approve (although some of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that plaintiffs or others similarly situated understood the extent to which the Bank, NFT and BAC would benefit from the Conversions and how the plaintiffs' accounts and other fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's fees for serving as a corporate fiduciary.

34. Upon information and belief, despite its ability to dictate the content of the Nations Funds prospectuses, at no time following the foregoing "disclosure" did the Bank make

25

any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments in the Bank's proprietary funds. Further, the defendants made no disclosure of the true motives of the defendants in carrying out the Conversions or the full extent to which the defendants were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally. Even after the Bank applied a so-called credit against its fees for some portion of the advisory fees charged to some of the proprietary funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of the Conversions to the fiduciary accounts and the income earned upon their assets. Indeed, plaintiff Reinke and certain other beneficiaries have sought to obtain such information or other similar information relating to the expenses of investing the assets of fiduciary accounts in the defendants' proprietary mutual funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

35.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the defendants' proprietary mutual funds at the time or before the Conversions were carried out for each fiduciary account as compared to pre-Conversion investments including any comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the assets of the fiduciary accounts in which plaintiffs and the members of the Class had an interest. Indeed, upon information and belief, the Bank

performed no serious analysis comparing the assets of the plaintiffs' accounts with the anticipated returns of the various Nations Funds in which the assets in such accounts were subsequently invested, which generated greatly reduced returns and higher expenses. Similarly, no such analyses were made by the Bank in fulfillment of its fiduciary responsibilities post-Conversion, which the Bank had a duty to perform on a regular basis. Assets of the fiduciary accounts within the Bank's control thus remained invested in the defendants' proprietary mutual funds, to the exclusion of most, if not all, others. Even assuming that the Bank made prudent decisions to purchase shares in the Nations Funds and other proprietary mutual funds for its fiduciary accounts, upon information and belief, as noted above, the Bank did not negotiate the fees and expenses to be charged to the Nations Funds (or other of the Bank's proprietary mutual funds) or comparison shop with other funds or families of funds or fund advisors in an attempt to obtain the same or better investment services elsewhere. Similarly, neither NFT nor its controlled Board of Trustees, sought to obtain the lowest fees from the subsidiaries of the Bank and BAC actually operating and "advising" the Nations Funds, nor did they seek lower cost and/or better qualified investment advisors either at the time of the Conversions or at any time thereafter.

36. Upon information and belief, BAC and the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual funds specifically requested by members of the Class) from their considerations in order to maximize their earnings and those of their corporate affiliates and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available while, at the same time, disclosing the benefits realized and to be realized by the defendants as a

27

result of investments in the Nations Funds. Indeed, the Bank coerced its portfolio managers to get them to invest fiduciary assets in the Nations Funds rather than alternative investment vehicles. As testified in the *Kutten* case by Darcy B. Johnson, a former Bank Vice-President and Portfolio Manager, if a portfolio manager selected non-proprietary mutual fund for investment in assigned fiduciary accounts, a black bomb with a fuse attached would appear on her computer screen warning her that the Bank regarded any such prospective investments as "exceptions" and that management would keep tally of such "exceptions" on a "scorecard" upon which her performance was evaluated for compensation purposes.

37. Similarly, with respect to those fiduciary accounts the assets of which were invested in the Bank's Common Trust Funds, at no time did BAC and the Bank give any consideration to making changes in the "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions.

38. Upon information and belief, as a result of a conspiracy among the defendants and others presently unknown, the Bank and BAC, as part of a corporate business decision, chose to invest the fiduciary assets of the Spencer Estate (of which plaintiff was a beneficiary), the IRA, the Benstein, Wilson and Williams Trusts and the members of the Class in shares of the Nations Funds as part of the Conversion and otherwise, as well as, in shares of other proprietary mutual funds in order to generate investment advisory and administrative fees and other revenues for their various affiliates and to "bulk-up" the Nations Funds and other mutual funds without regard to whether such investments were prudent and in the best interests of plaintiffs and the other beneficiaries of fiduciary accounts within the Bank's control.

39. The foregoing Conversions of the assets of fiduciary accounts to the Nations Funds and/or investment of fiduciary assets therein and in other of the defendants' proprietary

28

mutual funds generally was carried out in furtherance of the defendants' corporate plan to reduce the Bank's expenses of managing fiduciary assets and increasing unjustly BAC's overall direct and indirect profits from fiduciary operations. BAC and the Bank proceeded to carry out the Conversions since they would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through BAC's related asset management business and otherwise. Additional profit was also generated by investing the assets in the Bank's fiduciary accounts in the Nations Funds and in shares of other proprietary mutual funds following the Conversions, thereby making them more saleable at retail to the investing public. Further, the Conversions created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessors) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income and other revenues directly and indirectly through its corporate subsidiaries and affiliates.

40. The Bank and its affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and from the investment of fiduciary assets in the Bank's proprietary mutual funds generally thereafter. The Bank also benefited by receiving Trustee, Personal Representative or similar fees for serving as a corporate fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments in proprietary mutual funds have been of little, if any, benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including plaintiffs and the members of the Class. On information and belief, all members of the Class suffered damages

from the investment practices of the Bank as described above in an amount which cannot

presently be determined but which amounts are capable of calculation.

## CLASS ACTION ALLEGATIONS

### The Relief Sought for Members of the Class

41.    Over the past 15 years, BAC and the Bank, while making acquisitions around the

country increasingly consolidated their operations and centralized them into a nationwide

template consistent with the goals and objectives set out by Messrs. McColl, Lewis and Hance

affecting all members of the Class herein in substantively the same way.

As observed in the April 20, 1998 issue of the San Francisco Business Journal:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl
> Jr. has finally realized his manifest destiny, a decade-long quest to build a coast-
> to-coast bank.

> \*    \*    \*

> NationsBank will superimpose its corporate culture, computer systems and
> practices onto Bank of America."

> \*    \*    \*

> McColl discussed the issue of major American cities losing their hometown bank
> in a recent address in St. Louis, which lost its Boatmen's Bancshares to the
> Charlottean. with the headquarters of a major bank or financial institution,'
> McColl said. 'That's one of the realities of the market forces driving
> consolidation in our industry.'

> \*    \*    \*

> 'NationsBank has spent a great deal of time and effort over the last six years
> putting in a common platform of systems across its entire franchise,' said James
> Hance Jr., vice chairman and chief financial officer at NationsBank. 'We would
> expect to expand those systems across the entire BankAmerica franchise.'

> **A determined McColl defended the move at a San Francisco news
> conference, saying, 'It's good for our associates, it's good for our customers
> and it's good for our shareholders.'**

> **McColl recently told his shareholders that 'creating a single company is**

30

> **important from cost and efficiency standpoints, and it pays off for our
> customers in convenience and ease of doing business.        [Emphasis added]**

The Class as defined herein was effectively envisioned by Hugh McColl when he said at

the April 28, 1999  Annual Meeting of BAC's shareholders:

> The Model Bank [of Bank of America] is a system that brings together a nationwide,
> integrated technology platform with company-wide products and services, providing bank
> associates with complete information about customer relationships across product lines,
> business lines and geographic lines. **The single system enables us to roll out new
> products and services simultaneously to all our customers throughout the country
> with ease and consistency. It enables us to communicate with customers and on
> behalf of customers throughout the system. It enables us to provide customers with
> uniformity of product, service and experience, no matter where they are ......**the
> creation of a single, nationwide bank charter…will also enable us to eliminate redundant
> and costly administrative functions."

[Emphasis  added]

42.      This action is brought by plaintiffs, for themselves, and on behalf of all others

similarly situated, under the provisions of Federal Rules of Civil Procedure Rules 23(a) and

23(b)(3) for: "all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or

other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors,

successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly

invested in Nations Funds Mutual Funds at any time from September 8, 1998" to the present, (the

"Class"), the quoted portion of which definition was stipulated to by each of the defendants, their

affiliates and others in connection with the settlement of certain related claims against them in *In

re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-

Class".

43.      Plaintiffs seek, *inter alia*: (i) an accounting which determines all damages caused

by defendants to the members of the Class defined below and the extent of the unjust enrichment

of the defendants from their wrongful activities, as well as repayment of such unjust enrichment

31

and the earnings thereupon; (ii) money damages to be paid by the defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of members of the Class ahead of those of defendants and which otherwise address the ongoing conflicts of interest forced by the Bank in the investment of fiduciary assets including, *inter alia*, providing for the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations; (v) injunctive relief providing for the Nations Funds and other of the Bank's proprietary mutual funds to annually select investment advisors chosen based upon, *inter alia*, comparative investment performance and expense; and (vi) for relief incident and subordinate thereto, including substantial punitive damages as a result of the greed-driven and egregious self-dealing engaged in by defendants, as well as the costs and expenses of this action including an award of attorneys' fees and reimbursement of expenses to plaintiffs' counsel.

## Numerosity of the Members of the Class

44. Upon information and belief, the Bank serves as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein.

45. The Class represented by plaintiffs consists of all those persons including the beneficiaries of affected fiduciary accounts for which the Bank was corporate fiduciary from September 8, 1998 to the present ("Class Period"). The Missouri Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Missouri. The Washington Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Washington. The

Florida Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Florida. The New Mexico Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of New Mexico. The Iowa Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Iowa. Such definitions are subject to modification upon completion of discovery with respect thereto.

46. The exact number of members of the Class and the Sub-Classes as above described is not known by plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class and Sub-Classes are so numerous as to make a Class Action appropriate.

47. On information and belief, the members of the Class are located in most or all fifty states, and in numerous foreign countries.

48. Upon information and belief, while the members of the Sub-Classes are concentrated in the States of Missouri, Florida, Iowa, New Mexico and Washington, respectively, they are similarly scattered around the country and elsewhere.

## Common Issues of Law and Fact Predominate

49. On information and belief, at least two years prior to the Conversions, the Bank, at the direction of its parent, BAC, and in conspiracy with NFT and others, decided to invest the assets of the affected fiduciary accounts in shares of the Nations Funds and other proprietary mutual funds, all of which were directly or indirectly "advised" and managed by subsidiaries of defendants BAC and the Bank or their affiliates. Such Conversions were carried out nationwide on a rolling basis as an integral part of the consolidations by BAC and the Bank of the Acquired Banks subject to a master plan developed by them, Messrs. McColl, Hance and Lewis and others.

None of such separate Conversions differed materially despite the timing and different locales of each. Upon information and belief, the Conversions were approved and set into motion by the same committees of the Bank's Board of Directors, which included Messrs. McColl, Hance and Lewis and the administrative aspects of each of the Conversions were carried out by substantially the same group of employees of the Bank using common form documents, guidelines and operating methodology. Similarly, separate and apart from the formal Conversions, pursuant to directives from senior executives of the Bank, fiduciary assets were increasingly channeled into the Bank's proprietary mutual funds including Nations Funds money market funds, typically without any material disclosures made to the beneficiaries of the affected accounts.

50. All members of the Class and the Sub-Classes were adversely affected by the self-serving business decision of BAC and the Bank to invest the fiduciary account assets within the Bank's control into shares of the Nations Funds pursuant to the Conversions and/or in their proprietary mutual funds thereafter and/or otherwise invest fiduciary assets therein.

51. All of the Bank's fiduciary accounts and their beneficiaries were negatively impacted by the acquisitions of other financial institutions as described above. Among the material consequences thereof was the substantial reduction in the fiduciary services provided to the members of the Class and, in the wake thereof, the Conversions. All of the Bank's fiduciary accounts, the assets of which were invested in shares of the Nations Funds and others of the Bank's proprietary funds, paid directly or indirectly, administrative and investment advisory fees and other charges to subsidiaries and affiliates of BAC, based on the fiduciary assets invested by the Bank in such mutual funds. All fiduciary accounts of which the Bank was corporate fiduciary were damaged by reason of the higher expenses charged to such accounts as a consequence of

34

.    .

the Conversions and the lower investment returns generated as a result thereof and/or by
investments in the Nations Funds unrelated to the Conversions.

52.    There are common questions of law and fact that relate to and affect the rights of
each member of the Class including, *inter alia*:

(a)    whether the Bank's business decision to invest assets of the fiduciary
accounts in the Nations Funds and other proprietary funds was motivated by the best interests of
the Class members (which the Bank had a duty to put before its own) or by BAC's desire to
generate management and investment advisory fees for its affiliates and subsidiaries, to lower the
Bank's expenses of managing fiduciary assets and to generate other benefits for themselves and
NFT by, *inter alia*, "bulking-up" the assets invested in the Bank's proprietary funds;

(b)    whether the Bank breached fiduciary and contractual duties to plaintiffs
and the Class by failing to conduct its fiduciary operations in conformity with the requirements of
the National Banking Act, the guidelines established by the Comptroller of the Currency and
other applicable law and regulations and whether the other defendants aided and abetted such
breaches;

(c)    whether the Bank breached its fiduciary and contractual duties to all
members of the Class by making investment decisions for the fiduciary accounts of plaintiffs and
the Class based upon defendants' own interests and those of their affiliates, rather than the
interests of the beneficiaries of such fiduciary accounts and whether the other defendants aided
and abetted such breaches; and,

(d)    what remedies are appropriate compensation for the damages caused to
plaintiffs and each member of the Class.

35

53.    The relief sought is common to the entire Class including, *inter alia:*

(a)    a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by defendants BAC, NFT and others in doing so;

(b)    payment by the defendants of compensatory damages caused by their commission of and/or aiding and abetting breaches of fiduciary and contractual duties, as well as substantial punitive damages;

(c)    payment by the defendants of the costs and expenses of this action, including the attorneys' fees of plaintiffs' counsel;

(d)    an injunction preventing the Bank from opposing a petition by current beneficiaries of the fiduciary accounts affected by the Conversions and other wrongdoing referred to herein to replace it as corporate fiduciary; and

(e)    an injunction which establishes appropriate procedures and safeguards within the Bank and with respect to the operation of NFT to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

## Typicality of Plaintiffs' Claims

54.    The interests of each of the plaintiffs and each member of the Class have been adversely affected by the wrongdoing of the defendants as described herein.

55.    The assets of the respective plaintiffs' fiduciary accounts, like all other fiduciary accounts, were invested by the Bank in shares of its proprietary mutual funds pursuant to a wholesale business policy decision by BAC at the behest and encouragement of Messrs. McColl,

Hance and Lewis and/or their subordinates made some time prior to 1999 and carried out by the Bank and others thereafter pursuant to the Conversions and otherwise.

56. Upon information and belief, the plaintiffs' respective fiduciary accounts, like all other fiduciary accounts, was used by the Bank, the other defendants and their affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied to the Bank's fiduciary accounts as a result of certain Nations Funds advisory fees being paid to subsidiaries of BAC or the Bank) without regard for the best interests of the beneficiaries of such accounts such as plaintiffs and the members of the Class.

57. The claims of plaintiffs, who are representatives of the Class and the Sub-Classes, respectively, are typical of the claims of all members thereof. The claims of plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class and the Sub-Classes.

## Plaintiffs Will Fairly and Adequately Represent the Class and the Sub-Classes

58. The plaintiffs are able to and will fairly and adequately protect the interests of the Class and the Sub-Classes.

59. The attorneys for plaintiffs are experienced and capable of prosecuting complex litigation such as this case. The attorneys for plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## COUNT I

## BREACH OF FIDUCIARY DUTY

60. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

61. Upon information and belief, the Bank's self-dealing and egregious decision to invest the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts and those of the members of the Class in the Nations Funds and other proprietary funds was motivated not by the interests of plaintiffs and the Class members, but by BAC's desire to generate investment advisory and other fees for its affiliates and, indirectly, for itself, as well as, to reduce the Bank's operating expenses, all of which as carried out in the manner described above, was wrongful and damaged plaintiffs and each member of the Class.

62. Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider fairly the Bank's proprietary funds' high expenses or alternative lower cost families of mutual funds (and deliberately did not do so) when it invested the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts, as well as other fiduciary accounts into shares of the Nations Funds, thus putting its own interests before those of the plaintiffs and other beneficiaries of the Bank's affected fiduciary accounts

63. Upon information and belief, in conspiracy with the other defendants, the Bank failed to consider the best interests of the IRA, the Spencer Estate, the Benstein, Wilson and Williams Trusts and their beneficiaries when it invested fiduciary assets in the Nations Funds and breached its duty of loyalty to plaintiffs and other Class members by putting the interests of itself and its affiliates before the interests of plaintiffs and the members of the Class.

64. The Bank's wholesale investment of the assets of the Spencer Estate, the IRA and the Benstein, Wilson and Williams Trusts in the Nations Funds and the Conversions carried out around the country, as well as other investments of fiduciary assets in the Bank's proprietary mutual funds, were breaches of its fiduciary duty to plaintiffs and the members of the Class, which breaches were aided, abetted and/or directed by BAC, NFT and their affiliates. Given their

role in the Bank's fulfillment of its fiduciary responsibilities to plaintiffs and the members of the Class, the acts of BAC and NFT described herein also constitute breaches of fiduciary duty.

65.    As a result of, *inter alia*, the Bank's improper wholesale transfer of fiduciary assets held by the fiduciary accounts, including the accounts of the IRA, the Spencer Estate and the Benstein, Wilson and Williams Trusts, into shares of the Nations Funds and other proprietary mutual funds, plaintiffs and other similarly situated beneficiaries of fiduciary accounts for which the Bank was or is a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT II

## BREACH OF CONTRACT

66.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

67.    By means of the acceptance by the Bank and its predecessors of the responsibilities of personal representative and Co-Executor of the Spencer Estate, agreeing to manage the assets in the IRA for the benefit of plaintiff Cohen and his designees, agreeing to serve as trustee of the Benstein, Wilson and Williams Trusts, and otherwise agreeing to act as corporate fiduciary with respect to each of the other fiduciary accounts maintained by the Bank and its predecessors, the Bank committed to provide to all such fiduciary accounts complete investment management services of a corporate fiduciary and render such services on an individualized basis consistent with the goals and objectives of the creators of fiduciary accounts and the needs of the beneficiaries thereof as well as the representations made by the Bank in its advertising and marketing materials. As the Bank states: **"It is our responsibility to invest the trust assets prudently and profitably according to the grantor's wishes as outlined in the**

**trust document." Such promise by the Bank and its predecessors was a material implied term of each trust agreement or other document which established the underlying fiduciary relationship."** Such language or substantially the same language is an implied and material term in the agreements between the Bank and the creators of fiduciary accounts who appointed the Bank or any of the Acquired Banks as a corporate fiduciary, none of whom anticipated or could reasonably foresee that the Bank would breach its duty of loyalty to the creators of such accounts and their beneficiaries such as plaintiffs and the members of the Class. Similarly, they could not have foreseen that, in the context of their agreeing with the Bank to act as corporate fiduciary, the Conversions would be carried out by the Bank with fiduciary assets under the circumstances described herein, that the Bank would mishandle fiduciary assets as described herein or that the designated fiduciary would be the Bank in its present form as distinct from the Acquired Banks as the existed before acquisition by BAC and the Bank.. Plaintiffs and the members of the Class are the beneficiaries of the agreements made between the Bank and the creators of the fiduciary accounts which are the subject of this litigation.

68. Plaintiffs and each member of the Class were and/or are beneficiaries of the Bank's contractual obligations to the creators of the fiduciary accounts described herein and/or are third party beneficiaries to the contractual obligations among the defendants with respect to the investment of fiduciary assets. By abdicating its responsibilities for individual investment management services (in favor of the wholesale investment of fiduciary assets in shares of the Bank's proprietary mutual funds as described herein) that the Bank was obligated to provide to the beneficiaries of its fiduciary accounts, and by conducting itself in its present business form, the Bank breached its contractual obligations thereto. Defendants BAC and NFT aided and abetted the Bank in its breaches of its contractual obligations to plaintiffs and the Class by

40

participating with the Bank in carrying out the Conversions and/or causing the Bank to act as described above.

69.     By virtue of the defendants' breach of their respective contractual obligations owed to the members of the Class and the Sub-Classes, plaintiffs and the members thereof have suffered damages in an amount to be determined by the Court.

## COUNT III

## UNJUST ENRICHMENT

70.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

71.     By reason of the Bank's fiduciary assets being invested in the Nations Funds or other of their proprietary mutual funds as described herein, the Bank and BAC have "double dipped" and obtained other unjustified benefits as described above. All defendants have profited unjustly by the Conversions, the investment of fiduciary assets in the Bank's proprietary funds and the other acts described herein, thereby enriching themselves at the expense of plaintiffs and the members of the Class and the Sub-Classes. Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market various goods and services, including credit cards, loans and deposit accounts, from which products and services they have been unjustly enriched.

72.     Such "double dipping" was carried out by the Bank by imposing on fiduciary accounts the Banks' fees for acting as a corporate fiduciary as well as investment advisory fees, administrative fees and other related charges which, when taken together with all the NFT expenses, even after so-called credits for certain Nations Funds advisory fees (which credits may not have been applied by the Bank in connection with the fees it charged to all of its fiduciary

41

accounts) exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee, executor or similar fees were intended to cover. Such benefits to the Bank and BAC were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of the Bank's individualized investment and administrative responsibilities owed to the members of the Class and the Sub-Classes. The Bank enhanced its profit performance at the expense of plaintiff and the members of the Class by favoring the use of its own proprietary funds, including the Nations Funds, and fiduciary assets within its control to increase the asset bases thereof, and aggrandizing its own stature, thereby unjustly enriching each of the defendants and their senior officers as well as the Trustees of NFT.

73. Further, upon information and belief, with respect to at least certain of the fiduciary accounts for which the Bank has acted as corporate fiduciary, the total charges against such accounts for fees/commissions, advisory fees and other amounts payable by the accounts exceed the contractual amounts for such charges agreed upon by the creators of the underlying vehicles for the fiduciary accounts and/or statutory limitations thereof.

74. The defendants have invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts and other similarly affected accounts and/or their beneficiaries, as the Court shall deem appropriate. Plaintiffs and others similarly situated are entitled to recover the defendants' ill-gotten gains and profits therefrom.

## COUNT IV

## BREACH OF FIDUCIARY DUTY – MISSOURI STATE LAW

75. Plaintiff Cohen repeats and realleges each and every allegation contained above as if fully set forth herein.

76. By acting as alleged herein, the defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to plaintiff Cohen and members of the Missouri Sub-Class.

77. By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

78. By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes to plaintiff Cohen and the members of the Missouri Sub-Class.

79. By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiff Cohen and the members of the Missouri Sub-Class to take and exercise control over their fiduciary assets for their primary benefit.

80. The Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and they will continue indefinitely to extract unlawful fees and other charges from plaintiff Cohen and members of the Missouri Sub-Class, in an amount which cannot be presently determined.

## COUNT V

## BREACH OF FIDUCIARY DUTY – WASHINGTON, MISSOURI, FLORIDA, NEW MEXICO AND IOWA STATE LAW

81.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

82.     By acting as alleged herein, the defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to plaintiffs and the members of the respective Sub-Classes.

83.     By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

84.     By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to plaintiffs and the members of the Sub-Classes under the respective laws of the States of Washington, Florida, New Mexico, Missouri and Iowa which govern the conduct of fiduciaries such as the Bank.

85.     By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to plaintiffs and the members of the Sub-Classes to take and exercise control over their fiduciary assets for their primary benefit.

86.     Bank and its affiliates have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from members of the Sub-Classes in an amount which cannot be presently determined.

44

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request on their own behalf and on behalf of all members of the Class and the Sub-Classes:

(a) certification of this action as a Class Action and appointment of plaintiffs and their counsel to represent the Class and the Sub-Classes;

(b) entry of judgment on the claims for breach of fiduciary duty in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the defendants and an award of compensatory damages, restitution and punitive damages in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes, respectively, and against the defendants in the amount of damages caused by the defendants' breaches of fiduciary duties;

(c) entry of judgment on the claims for breach of contract in favor of plaintiffs individually and as representatives of the other members of the Class and Sub-Classes against the defendants and an award of compensatory damages in favor of plaintiffs individually and as representatives of the other members of the Class and the Sub-Classes and against the defendants in the amount of damages caused by the defendants' breaches of contract;

(d) entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(e) entry of judgment compelling the defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the affected fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(f) entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of BAC and NFT by, *inter alia,* establishing a so-called "Chinese Wall" for the purpose of effectuating such insulation;

(g) entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia*, the appointment of an ombudsman to oversee the Bank's fiduciary operations and compelling NFT and the Bank's other operators of its proprietary mutual funds to select annually investment advisors based upon, *inter alia*, comparative investment performance and expenses and the holders of the affected mutual funds;

(h) repayment to the affected Nations Funds and the holders of its stock of the damages caused to them by the defendants' actions as described herein;

(i) entry of judgment for punitive damages, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

(j) reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation; and

(k) such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

December 27, 2005          GREENFIELD &GOODMAN LLC
                           RICHARD D. GREENFIELD
                           7426 Tour Drive
                           Easton, MD 21601
                           (410) 745-4149
                           (410) 745-4158 (Fax)

46

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

*Steven M. Hamburg*

STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800
(626) 685-9808 (Fax)

COUNSEL FOR PLAINTIFFS AND THE CLASS

410140_1.DOC