## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

GEORGE SIEPEL; PHYLLIS SIEPEL;
H. CRAIG WILLIAMS; ELINOR TAMA
WILLIAMS; CONSTANCE ELAINE
WILLIAMS; DONNA N. REINKE;
ROBERT COHEN; CARL M. PAGE
and all others similarly situated,

                 Plaintiffs,

    v.

BANK OF AMERICA, N.A.;
COLUMBIA FUNDS SERIES TRUST
f/k/a/ NATIONS FUNDS TRUST; COLUM-
BIA MANAGEMENT ADVISORS, LLC;
COLUMBIA MANAGEMENT DISTRI-
BUTORS, INC. ; BANC OF AMERICA
INVESTMENT SERVICES, INC. and
BANK OF AMERICA CORPORATION,

                 Defendants.

Case No. 05:CV:2393  RWS

JURY TRIAL DEMANDED

CLASS ACTION

### AMENDED COMPLAINT[1]

COME NOW Plaintiffs George Siepel, Phyllis Siepel (collectively, "Siepel Plaintiffs"),

H. Craig Williams, Elinor Tama Williams, Constance Elaine Williams (collectively "Williams

Plaintiffs"), Donna N. Reinke, Robert Cohen and Carl M. Page, on behalf of themselves, and for

all other members of the Class hereinafter described, by and through counsel, seek damages from

the Defendants and injunctive relief and state and allege as follows:

### OVERVIEW

1.      This Class Action is brought by Plaintiffs on behalf of themselves and all others

similarly situated, all of whom are or were beneficiaries of fiduciary accounts for which the

Defendant Bank of America N.A. (the "Bank") serves or served as corporate fiduciary.  The

---

[1]This Complaint is filed as a matter of right prior to the filing of a responsive pleading by any Defendant herein
pursuant to Fed. R. Civ. Proc. 15(a).

allegations in this Complaint are directed at the Bank as well as certain of its subsidiaries, Columbia Management Advisors, LLC ("CMA"), Banc of America Investment Services, Inc. ("BAI") and Columbia Management Distributors, Inc. f/k/a BACAP Distributors, LLC ("BACAP") and their ultimate parent company, Bank of America Corporation ("BAC") for their breaches of fiduciary and contractual duties owed by them to beneficiaries of fiduciary accounts ("Clients") as well as their violations of the federal securities laws as specified herein. BAC owns and controls various other entities, including BAI, BACAP and CMA, (collectively, the "Bank Subsidiaries") which effectively operate and carry out various underwriting and other activities on behalf of the Bank's proprietary mutual funds described below, nominally on behalf Columbia Funds Series Trust f/k/a/ Nations Funds Trust ("NFT"),  during the relevant time period.

2.      The Bank and BAC are "control persons" of the Bank Subsidiaries and NFT under and pursuant to the federal securities laws and are liable for their activities described herein including, in particular, causing the filing of NFT registration statements and post-effective amendments thereto with the Securities and Exchange Commission ("SEC") and dissemination of Nations Funds prospectuses.  At least one or more of the foregoing Bank Subsidiaries, NFT and the Bank hold themselves out to the public and/or are registered as such with the SEC as "Financial Advisors" and "Investment Companies" under the Investment Company Act of 1940 as amended, 15 U.S.C. § 80b-1 et. seq., (the "1940 Act").

3.      Collectively, at all relevant times, the Bank, NFT and the Bank Subsidiaries were and are underwriters and/or issuers of the securities of the Bank's proprietary mutual funds. This Complaint alleges that the Bank and BAC, by and through NFT and the Bank Subsidiaries which operated the Defendants' proprietary mutual funds business, breached the fiduciary duties owed

2

to their Clients by failing to disclose, *inter alia,* material conflicts of interest at the time disclosures were required to be made, as well as by failing to disclose the incremental increases in expenses the Clients sustained when the Bank and BAC implemented a corporate decision on a nationwide basis to funnel assets in  the Bank's fiduciary accounts to the Bank's proprietary mutual funds, the Nations Funds, nominally overseen by the Bank's alter ego, Nations Funds Trust ("NFT"), registered with the SEC as an open-ended management investment company under the 1940 Act. In connection with sales of the shares in these proprietary mutual funds to the accounts of Plaintiffs and all members of the Class as defined below, the Bank, NFT and the Bank Subsidiaries failed to exercise good faith and fully disclose all material facts and failed to fully disclose all material facts to them and/or exercise reasonable care to avoid misleading them as more fully set forth below.

4.      The corporate-wide policy of BAC and the Bank was clearly set forth in an October 1, 1999 letter from Bank Vice President W. Thomas Chulick, in response to a request by the Hon. Mary Ann Medler,  that the assets in her family's trust accounts be invested in mutual funds other than in the Bank's proprietary funds. Mr. Chulick informed Judge Medler that:

> "The [Administrative and Investment Review] Committee reiterated that **the use of outside mutual funds in fiduciary accounts is in violation of our corporate investment policy."**   [emphasis added]

5.      In addition to common law claims, claims are also asserted herein by the Siepel Plaintiffs individually and on behalf of a Sub-Class (the "Federal Securities Law Sub-Class") of all others similarly situated (as defined below) under and pursuant to the Securities Exchange Act of 1934 ("Exchange Act"), the Securities Act of 1933 ("Securities Act")  and  the 1940 Act. Certain claims are also asserted herein against the Bank on behalf of Florida, Washington,

3

Missouri, New Mexico and Iowa Sub-Classes as defined below. Unless the context indicates otherwise, the term "Class" includes the members of each of such Sub-Classes.

6.      The Bank through its "Private Bank, " formerly based in St. Louis with offices throughout the United States, administers fiduciary accounts and offers a variety of financial planning and investment advisory services to the public, including customized management of the portfolios held in fiduciary accounts and individualized services for its Clients.

7.      As an integral part of the investment advisory services the Bank and the Private Bank offer to the public, the Bank promotes that it has expertise in management of financial resources and "customized unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and bank services." The Bank, in order to obtain the leverage and economies of scale referred to below, engages in "asset gathering" for its "Private Bank" and for its captive mutual funds. The Bank advertises on its website and otherwise and holds itself out as providing expertise in portfolio management, proclaiming in particular its **experienced investment advisors**. The Bank prominently and falsely advertises its promise and holds itself out to persons such as Plaintiffs and the members of the Class who do business with its "Private  Bank":

**BANK OF AMERICA  [LOGO]  HIGHER STANDARDS**

THE PRIVATE BANK

**Managing today's complex wealth.**

**Balancing growth, risk, taxes**

**and grandchildren.**

As your financial resources increase, perhaps you need more financial resources to manage them.  The Private Bank of Bank of America has greater depth and breadth of wealth management expertise – across the financial spectrum – than

4

any other private bank. Equally important, we bring this expertise together, creating more integrated solutions to your complex needs.  And we provide these customized recommendations based on the extraordinary strength and stability of Bank of America.

It's no wonder we've been entrusted to manage, protect and pass on wealth for more than 150 years.

*The Private Bank is dedicated to serving affluent families and individuals with complex wealth management needs. Our experienced advisors customize unique and comprehensive solutions for each individual, integrating world-class investment management, trusts, credit and bank services. We welcome the opportunity to work with you. We invite you to call Caroline Grace at 800.863.9500 or visit www.bankofamerica.com/privatebank.*  [Emphasis in original].

8.     In fact, despite numerous substantially similar promises in the form of advertising, marketing pieces and direct representations to those who established fiduciary accounts with the Bank (and the beneficiaries thereof),  as described herein, those promises have been and are being uniformly ignored or deliberately broken. In the context of their numerous acquisitions of other financial institutions to create a nationwide "wealth management" business, Hugh McColl,  James Hance and Kenneth Lewis, the senior-most officers of BAC and the Bank) centralized the functions of the Acquired Banks defined below into the Bank's own template, forcing more and more fiduciary accounts to be "serviced" by Call Centers and as many of such accounts' assets into the Bank's proprietary mutual funds, the Nations Funds and now being  re-named as Columbia Funds. In the course of carrying out their "master plan," they and their confederates at the helm of NFT sacrificed the interests of the beneficiaries of the affected fiduciary accounts in favor of the Defendants' "bottom line" as described herein.

9. (a)    The focus of this lawsuit is, in the context of a massive acquisition spree described below,  the corporate strategy of BAC and the Bank to consolidate the fiduciary operations of the various Acquired Banks and to generate operational efficiencies therefrom to

5

make up for the deterioration of the Bank's traditional profit model, commercial lending. In the course of carrying out such strategy, BAC and the Bank planned to and did bulk-up their captive and proprietary mutual funds business to provide the Bank with incremental sources of profit from fee and other income generated by its subsidiaries and affiliates, including the Bank Subsidiaries. They did so from various services provided to the Nations Funds, including investment advisory, distribution and other services. The assets held in the Bank's fiduciary accounts were and are a perfect "cookie jar" for the Bank to use to "seed" and/or bulk-up its proprietary mutual funds and better enable the Bank to streamline its so-called "Private Bank," increase the use of "Call Centers" and otherwise extract economies of scale from fiduciary operations.

(b) In particular, in order to maximize the Bank's profits earned from the Bank's fiduciary accounts for which it acted as corporate fiduciary, the Defendants conspired among themselves and with others presently unknown in a series of business decisions to "double dip," by forcing the Bank's fiduciary accounts, to the greatest extent feasible, to have their assets re-directed from their historic allocations in individually managed accounts and/or so-called Common Trust Funds ("CTFs") and/or other assets, to the Bank's proprietary mutual funds controlled by the Bank Subsidiaries ("Conversions") and/or to force the investments of such assets into the Nations Funds directly. They so conspired by agreeing to act together for their unjust enrichment at the hands of Plaintiffs and the members of the Class, all of which caused them substantial damages as described below. In all such transactions, NFT was the issuer of Nations Funds shares and the Bank and Bank Subsidiaries were the underwriters of the securities being offered and sold to the Bank's fiduciary accounts and to Plaintiffs and members of the Class beneficially.

6

(c)  As used herein, the term "Conversions" refers to the wholesale asset re-directions by the Bank of fiduciary assets within its control into shares of the Nations Funds during the Class Period as referred to below. The "double-dip" refers to the Bank (through the Bank Subsidiaries and otherwise)  extracting fees and expenses from the affected fiduciary accounts, directly and indirectly,  through the investment of the assets in those accounts in shares of various Nations Funds mutual funds taken together with the Bank's traditional fees charged to each account for serving as a corporate fiduciary.

(d)  At no time has the Bank distributed to Plaintiffs or to any member of the Class defined below or to any other appropriate recipient any statement fully and completely disclosing the wrongdoing described below including, *inter alia*,  its conflicts of interest associated with the use of Nations Funds in its fiduciary accounts or the sale of Nations Funds shares thereto.  Nor did it disclose to the victims of the Conversions that the expenses ultimately paid by the Bank's fiduciary accounts from the use of Nations Funds would increase materially as a direct result of the Conversions, facts known to and concealed  by the Defendants from the Nations Funds prospectuses and other Conversion Disclosure Documents (i.e. those documents disseminated by the Defendants in connection with the offering and sale of Nations Funds shares to the Bank's fiduciary accounts in connection with the Conversions).   Further, the Defendants' wrongdoing is continuing in nature.  By late 2005, following the acquisition of another bank together with the fiduciary accounts under its management, Fleet Bank, the Defendants increased the assets in their proprietary mutual funds to over $400 billion and, at the same time, further reduced fiduciary services to the beneficiaries of those accounts. In addition to the Nations Funds shares issued and sold by the Defendants to the fiduciary accounts of members of the Class in and pursuant to the Conversions, such shares were also issued and sold to such accounts otherwise

7

through, *inter alia,* initial investments, reinvested dividends and interest, purchases of Nations Funds money market mutual funds and by other means.

(e)  As a corporate fiduciary, the Bank, together with the other Defendants, was required to be scrupulously forthright, honest and candid with the Plaintiffs, those acting on their behalf and all of the members of the Class, to place their interests above their own, and to supply every beneficiary of the Bank's fiduciary accounts with all the information that a reasonable person might consider relevant to investments in such accounts.  Unbeknownst to Plaintiffs and the members of the Class, however, the Defendants failed to disclose material facts including, *inter alia,* the critical conflicts of interest that were embedded within the fiduciary, investment advisory and other services they provided and the other services they offered, particularly with respect to the purchases of Nations Funds for their accounts.

(f)  Historically, the Bank, either through its so-called "Private Bank," now based in New York, New York [2], or through the Trust Departments of it and its predecessors, promoted itself by touting its purportedly highly individualized trust administration and asset management services, all of which was intended to and did lure grantors, testators and others to designate the Bank as a fiduciary for estates, trusts and other fiduciary accounts.

(g)  In fact, the plans of the Bank, BAC and their respective predecessors, despite these and substantially similar representations over the years and the implicit incorporation of them in the documents governing the Bank's fiduciary accounts, have been to cut back substantially on such so-called "Customized Portfolio Management" and to direct fiduciary funds, once

---

[2]  To consolidate its own position in the Midwest, the Bank's predecessor, Nations Bank, acquired Boatmen's Bancshares, Inc., the parent of Boatmen's Trust Company ("Boatmen's"). The Bank used Boatmen's trust department as the core of its Private Bank, then proceeded to distribute its administrative functions to Private Bank Offices in various parts of the country. As more and more acquisitions of financial institutions around the country were made by Defendants, the "Private Bank" and/or the related asset management functions of the Bank also moved, most recently to Boston and now to New York City.

8

"captured," into standardized investments such as the Bank's proprietary mutual funds, including, *inter alia*, the Nations Funds, as part of the Conversions as described herein and otherwise. Few, if any of the grantors or others who established fiduciary relationships with predecessors of the Bank, such as, *inter alia*, envisaged the Bank in its present form; namely, a nationwide behemoth with few of the individual services typically offered by a fiduciary and implicit in the fiduciary relationship. The Defendants took advantage of their power over beneficiaries of fiduciary accounts and have utilized these captive accounts and their beneficiaries as targets to market other products and services sold by the Defendants through "Relationship" Managers, their subsidiaries, affiliates and otherwise, including loans, credit cards and deposit accounts, all to Defendants' enrichment.[3]

      (h) The Bank and BAC failed to disclose the existence of blatant conflicts of interest which are endemic in the relationship between and among the Bank's sales force, its employees and the members of the Class. Specifically, the policy of the Bank was to avoid investing fiduciary assets in non-proprietary mutual funds while touting, at the same time, the provision of customized portfolio management and to recommend portfolio strategies to meet a client's investment goals. To lure or retain fiduciary accounts, the Bank created a public image designed to foster the belief that the "Private Bank" is a reliable provider of customized financial advice. "Private Bank" employees, acting under pre-determined Bank policy, provide investment planning advice under the guise that this advice is customized when in fact it is not. Instead, the Bank delivered a platform to peddle the Defendants' proprietary mutual funds and other financial "products". The Defendants' scheme was never disclosed to the Bank's Clients and included, but was not limited to:

---

[3] For a vivid history of the Bank's voracity for conversions of assets which it held as a fiduciary, see:

     (i)   the Bank's failure to disclose that it did not consider any  non-proprietary mutual funds as appropriate for investments in fiduciary accounts;

     (ii)   the Bank's failure to disclose adequately that it had a direct financial interest in selling its own proprietary mutual fund products to its fiduciary accounts;

     (iii)   the Bank's failure to disclose that the Conversions would result in a material increase in the expenses of investing the assets of affected fiduciary accounts at the expense of Plaintiffs and the members of the Class;

     (iv)   the Bank's failure to disclose to Plaintiffs,  members of the Class and others to whom disclosure was required that it had not negotiated in any meaningful way the fees and expenses that were being charged to the Nations Funds by the Bank's affiliates (including the Bank Subsidiaries) and that the Bank did not negotiate with non-affiliated firms that could provide the same investment advice or other services at lesser cost;

     (v)   the Bank's "customized portfolio management" typically included only the purchase of the Bank's proprietary mutual funds when mutual funds were used as the sole investment vehicles for fiduciary accounts; and

     (vi)  many of the Bank's proprietary funds were  new or relatively new funds with no established track record of returns; indeed, many of the funds in the Nations Funds family would not exist but for the Conversion of fiduciary assets into them.

---

http://www.bankofamerica.com/newsroom/press/archives.cfm?LOBID=1.

10

(i)      Each element to the Bank's scheme created a conflict of interest between the financial well-being of Plaintiffs and the members of the Class on the one hand and the Defendants' financial well-being on the other. None of these material facts were expressly disclosed to Plaintiffs, members of the Class or to others to whom the Bank was obligated to make disclosure, in any of the letters and other documents provided to them at the time of the Conversions at the time the Bank was soliciting its designation as corporate fiduciary or during the time the Bank served as fiduciary of the affected accounts. Throughout the Class Period as set forth below, each of the Defendants was keenly aware that these schemes created material conflicts on interest between themselves and the Bank's Clients. All of the Defendants kept these conflicts of interest hidden throughout the Class Period as defined below. As a consequence, the Defendants engaged in rapacious self-dealing to the detriment of each of the Plaintiffs and the members of the Class and, because of the failure to separate the Bank's fiduciary operations from all its other businesses and those of BAC and the Bank Subsidiaries, its continued performance as a corporate fiduciary is and remains materially flawed.

## ACQUISITIONS OF OTHER FINANCIAL INSTITUTIONS

10.      Over the course of the last 15 years, the Bank and BAC have made numerous acquisitions of other financial institutions throughout the United States (the "Acquired Banks"), many of which acquisitions were driven by their former Chairman and Chief Executive Officer, Hugh L. McColl, Jr. assisted by his subordinates, Kenneth Lewis,  current Chairman and Chief Executive Officer and James  H. Hance, Jr., former Vice Chairman and Chief Financial Officer, whom Mr. Lewis described as "one of the key architects of [BAC and the Bank] as it has grown to be one of the largest financial service providers in the world."

11

11.     A press release issued by the Bank on July 28, 2000, shortly after it had put into operation a corporate-wide plan to eliminate many of the investment-related and other services to beneficiaries of fiduciary accounts as described herein,  explained,  in part, how Messrs. McColl. Lewis, Hance and their subordinates were going to carry out this plan, including the elimination of those personnel who provided services to fiduciary account beneficiaries while at the same time increasing the fees paid by them:

> As part of these initiatives, the company will eliminate between 9,000 and 10,000 positions mostly during the next 12 months, in order to reallocate resources. The principal focus of these reductions will be in middle and senior management and positions eliminated as a result of process improvements. These reductions will take place across the company's franchise. The company now employs about 150,000 people.
>
> "We have been saying for some time that our days of growth by merger and acquisition are behind us," said Chairman and Chief Executive Officer Hugh L. McColl, Jr. "For the most part, our merger transition work also is behind us. We have successfully built a company with unlimited potential. To date, despite our many successes in individual businesses, we have not made the degree of progress we would like toward realizing that potential. We've assembled the right parts, but after years of additions, our resulting structure is neither as efficient, nor as effective as it needs to be. We're going to fix it in order to take advantage of our revenue opportunities."
>
> *   *   *
>
> Lewis also announced steps to boost productivity. First, he said, the company intends to eliminate management layers, giving top executives more direct responsibility for customer service. Second, it will overhaul processes and organizational structures to simplify and expedite banking transactions for customers and deliver financial solutions that lead to profitable relationships. These changes, which are still being designed, could affect everything from credit underwriting procedures to call center technology and are heavily weighted toward enhancing revenue growth.
>
> *   *   *
>
> Vice Chairman and Chief Financial Officer James H. Hance, Jr. said the company plans to take a charge of $300-350 million after-tax in the third quarter, primarily to cover severance costs related to the initiatives announced today. Productivity gains are expected to pay for severance and other related costs in approximately one year. Hance added that a substantial portion of these savings will be earmarked for reinvestment.

12

12.     Mr. Hance also emphasized what the acquisitions of other financial institutions was intended to accomplish for BAC and the Bank. In a November 19, 1998 speech in St. Louis, he said:

> We also are diversifying our revenue stream away from dependence on gathering deposits and lending them and toward fee income. The latter is now about 40 percent of our total revenues, and our goal is to push fees to more than half of revenues in a short period of time.
>
> \*       \*       \*
>
> The leverage as you increase the assets of a fund is significant.
>
> \*       \*       \*
>
> **The most obvious advantage of scale is cost. Perhaps the best advantage is the exploding world of mutual funds. As the second largest player among banks, we have achieved significant scale. The leverage as you increase the assets of a fund is significant. After all, one money manager can manage $5 million or $50. So as you get bigger, you get much, much more profitable.**
> [Emphasis added]

13.     On April 17, 1998, the <u>San Francisco Business Times</u> noted with respect to the acquisition/consolidation strategy of Mr. McColl:

> With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl Jr. has finally realized his manifest destiny, a decade-long quest to build a coast-to-coast bank.
>
> \*       \*       \*
>
> Those familiar with McColl's style can already see the early signs that the former Marine's typical acquisition strategy is under way. The folksy, Southern charm of McColl and his troops belies a finely tuned merger machine in which an acquired institution's culture and identity are efficiently blended into NationsBank. The Charlotte bank has digested more than 70 deals since 1980. With that level of experience, the bank is not likely to repeat the customer service problems that arose from another San Francisco merger, Wells Fargo's purchase of First Interstate Bank."

13

14.     During a speech he delivered in Charlotte on May 26, 2004, Mr. Lewis, in

explaining how BAC and the Bank could justify the high-cost acquisitions of other banks in

financial terms said:

> In deliberating the wisdom of [their most recent] merger, much of the
> discussion outside the company has focused on expense savings and
> efficiencies. That's understandable- the history of mergers in our industry
> has been all about expense leverage. I believe expense savings and
> efficiency in this merger are critical, but only as a starting point.
>
>     Mr. Lewis' explanation of how BAC and the Bank could squeeze
> "savings and efficiencies" from BAC's then most recent acquisition was
> reinforced in the business media several months later in April 2004 by
> David Pauly, writing for Bloomberg News:
>
> In October, [BAC] CEO Kenneth Lewis announced the $48.1 billion
> takeover of Fleet Boston Financial Corp.-thereby infuriating Bank of
> America shareholders who said Lewis had committed himself to managing
> the company's myriad acquisitions of the past.
>
>         *   *   *
>
> Lewis offered Fleet Boston stockholders a premium of 43% above the
> market price. **A lot of jobs will have to go to make up for the excessive
> payment.**   [emphasis added]

15.     In the context of this nationwide series of acquisitions, and in order to justify the

high premiums that Messrs. McColl, Lewis and Hance were paying for the Acquired Banks, with

each new acquisition, they required the centralization and streamlining of the fiduciary services

offered by the Bank, including the increased usage of Nations Funds as  vehicles for investment

of the Bank's fiduciary assets. At the same time, they planned to extract greater benefits from the

fiduciary accounts of the Bank and the Acquired Banks by forcing the assets therein to be sold

and reinvested in the Bank's proprietary mutual funds, thereby obtaining the very leverage and

economies of scale (for the Bank Subsidiaries and NFT) as Mr. Hance proclaimed would be

obtained in his speech on November 19, 1998.

14

16.     The settlors of certain of the trusts at issue, in entrusting their assets to local banks, whether Boatmen's Trust Company in St. Louis, Barnett Bank in Florida or Fleet Bank in Boston, among other Acquired Banks,  did so based upon personal relationships with officers of such Acquired Banks built over many years. These fiduciary relationships were established because, *inter alia*, the Acquired Banks held themselves out to the settlors and to other prospective customers of fiduciary services as institutionally and personally suited not only to the stewardship of settlors' assets over multiple generations but looking after their descendants or other designated beneficiaries of their largesse. Over the years, the Bank and its corporate predecessors swallowed-whole the Acquired Banks, financial institutions nationwide which had fiduciary responsibilities to Plaintiffs and members of the Class.  In the process of being digested by the Bank, these formerly independent institutions' fiduciary operations were transmogrified into just cogs in the fee-generating machinery of the Bank and its corporate parent just as Messrs. McColl, Hance and Lewis predicted would occur.

17.     In the course of the metamorphosis of Boatmen's Trust Company and other acquired financial institutions into the Bank, the interests of Plaintiffs and members of the Class were not represented by caring, knowledgeable trust officers but  frequently by so-called "Call Centers" in Dallas, Atlanta  and elsewhere manned by relatively lower-level Bank personnel with little or no investment expertise and portfolio managers who employ computerized asset allocation programs designed to maximize the use of the Bank's proprietary funds in fiduciary accounts. Except for the highest net worth fiduciary accounts, the "customized recommendations" and "wealth management expertise" promised by the Bank are fictions and have been fictions since the consolidation of the various Acquired Banks  began taking place. The purpose was clear.  As stated by the Bank's own press release:

15

> We will win more business from existing Private Bank Clients by proactively delivering cutting-edge solutions for wealth management, by continuing to win high marks for satisfaction and high touch service, and through the company's financial commitment to the Private Bank which will allow for increased marketing and heightened awareness of the value we bring to each relationship.

18.    At or prior to the time that Boatmen's Trust Company, Barnett Bank and Fleet Bank, among other Acquired Banks were merged into the Bank, it was known by the parties to the acquisition negotiations that the Bank, through its planned consolidations, would materially adversely affect the investments in and administration of the fiduciary accounts at the Acquired Banks.

19.    To the best of the knowledge, information and belief of Plaintiffs, neither Boatmen's nor Nations Bank (as the Bank was then known) provided appropriate written notice as provided in statutes such as §362.331 R.S.Mo., of its transfer of fiduciary capacities to the Bank or which disclosed the material adverse affect of such transfer or which advised interested parties that they had a right to object to the transfer and, *inter alia*, obtain a replacement fiduciary.

20.    Plaintiffs believe and therefore allege that the Bank similarly failed to provide such notice in each of the instances where the fiduciary responsibilities of an Acquired Bank were taken over by the Bank or one of its predecessors.  As such, all similarly affected beneficiaries were wrongly denied notice and the right to object to a transfer of fiduciary responsibilities to the Bank.

## **NATIONS FUNDS**

21.    (a) Nations Funds Trust ("NFT") is an investment company and Delaware statutory trust which houses a "family" of more than 70 mutual fund portfolios, which are

16

proprietary funds nominally operated by NFT and its Board of Trustees. Even though no more than 60% of NFT's Board is supposed to be an "interested" person, in fact all members thereof were, in fact, elected, re-elected, directed and controlled by the other Defendants, including the Bank Subsidiaries.

(b) It has been the Bank's policy, throughout the Class Period defined below, both before and after the Conversions, to force the assets of its fiduciary accounts into shares of the Nations Funds and other proprietary mutual funds as stated in the letter from the Bank dated October 1, 1999 to Judge Medler as referred in ¶1(d) above.

(c) The Nations Funds' portfolios cover a wide variety of investment disciplines, strategies and types of asset categories including, *inter alia*, the Nations Municipal Income Funds, the Corporate Bond Portfolio; the Nations Small Company Fund; Nations Large Cap Index Funds and Nations Cash Reserves. The Nations Funds are nominally operated by the NFT and its Board of Trustees, a majority of whom are purportedly independent. In fact, the Bank, as the largest single shareholder of record of the various Nations Funds, controls all nominees to the NFT Board and therefore is a "control person" with respect to NFT, Nations Funds and the Bank Subsidiaries, as such term is defined in the federal securities laws and, in particular, § 15 of the Securities Act and §20 of the Exchange Act..

(d) Certain of such Nations Funds were funded by the Bank and the Bank Subsidiaries in substantial part by transferring fiduciary assets pursuant to the Conversions, in effect, "force selling" Nations Funds shares to and upon the Bank's captive fiduciary accounts for which it served as corporate fiduciary. Such funding permitted the affected Nations Funds to have substantial asset bases, an important selling point to the Defendants in marketing shares in the Nations Funds to other potential purchasers thereof through the Bank and other subsidiaries

17

of BAC. The Nations Funds selected for investment of fiduciary assets by the Bank and Bank Subsidiaries pursuant to the Conversions were intended generally to "mirror" the categories of assets held by the Bank's fiduciary accounts pre-Conversion, all or most of which were liquidated immediately prior to the Conversions,  either as part of so-called "Common Trust Funds" or in individually-managed accounts, in many cases generating premature capital gains and causing the premature payment of taxes thereupon. At no time did the Bank disclose to affected account beneficiaries that the disposal of assets in their fiduciary accounts in connection with the Conversions generated capital gains and caused capital gains taxes to be paid prematurely. Indeed, the Defendants portrayed the Conversions in the Conversion Disclosure Documents and otherwise as being entirely tax-free transactions.

### JURISDICTION AND VENUE

22 .    The claims asserted herein arise under and pursuant to state statutes and common law as well as 15 U.S.C. §§78j(b) and 78t(a) (the "Exchange Act");  Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R.§240.10b-5;   15 U.S.C. §§ 77k and 77l (the "Securities Act") and 15 U.S.C. §§  80b-6 and 80b-14 (the "1940 Act" ). This Court has jurisdiction under 28 U.S.C. § 1331and §22 of the Securities Act, 15 U.S.C. §77v; §27 of the Exchange Act and 28 U.S.C. §1711, the Class Action Fairness Act of 2005. This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction).

23.    There is diversity of citizenship between plaintiffs, citizens of the states of Washington, Florida, Pennsylvania, Illinois, Missouri and New Mexico, and each of the defendants. Further, the claims of all members of the Class well exceed $5,000,000, exclusive of interest and costs. Although a substantial number of members of the Class reside in Missouri, more than two-thirds of the Class members are residents of other states.  The conduct of the

Defendants as described herein occurred directly and indirectly within the Eastern District of Missouri, as well as in other states including North Carolina, Florida and New York. Further, each of the Defendants had continuous, material and systemic contacts within this District through, *inter alia*, the offices of the "Private Bank" and otherwise. Accordingly, this Court has personal jurisdiction over all the Defendants pursuant to §506.500 R.S.Mo.

24.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 15 U.S.C. § 80b-14 as many of the acts and practices complained of herein occurred in substantial part or arise out of Defendants' activities in this District, including, *inter alia*, the establishment of fiduciary accounts for the benefit of Plaintiff Cohen and numerous other members of the Class as defined herein, the drafting, issuance and dissemination of Nations Funds prospectuses in and from this District and the tortuous interference with the contracts of members of the Class within this District. Further, Boatmen's Trust Company, a corporate predecessor of the Bank, was based in this District, as was the Bank's "Private Bank." Additionally, the Williams Plaintiffs, among other members of the Class, received from David Fisher, President of the "Private Bank" when it was based in St. Louis, the Conversion Disclosure Documents. Further, many of the most significant witnesses to the wrongdoing referred to herein are found in and/or did business within this District and will only be available for trial purposes in this District. In addition, a substantial amount of documents relevant to this dispute were generated by the Bank from this District and each of the Defendants has multi-national legal counsel who conduct business within this District.

25.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

19

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

**THE PARTIES**

26.     Plaintiffs are all present or former beneficiaries of the Bank's fiduciary accounts who were victims of the Defendants' scheme to enhance profits from using the Bank's captive proprietary mutual funds, the Nations Funds, as investments for their fiduciary accounts. Each of such Plaintiffs and the members of the Class are related to one another by being damaged at the expense of Defendants' activities as described herein.

(a)     Plaintiff Donna N. Reinke is a citizen of the State of Washington and was a beneficiary of the Estate of Margaret Spencer, who died on September 11, 2001. ("Spencer Estate" or the "Estate")  The Bank, together with two individuals, Neil MacKinnon and William Morris, were the Personal Representatives/Co-Executors of the Spencer Estate, the assets of which were invested until December 2003, when the remaining cash was distributed to Plaintiff Reinke and the other beneficiaries of the Estate. Although the physical administration of the Estate was carried out in the State of Washington and it was probated by a Washington probate court (the Superior Court), the weight of the conduct giving rise to Plaintiff Reinke's claims as asserted herein; i.e. the appropriateness of investing fiduciary assets of the Estate in shares of the Bank's proprietary mutual funds, was in this District, the former home of the "Private Bank," which was the focal point for the wrongdoing alleged herein. Although Plaintiff Reinke signed a Receipt and Waiver of Notice of Filing  Declaration of Completion of Probate on March 6, 2004, she was induced to do so by the filing of a false and misleading Declaration of Completion of Probate which, *inter alia*, concealed from Plaintiff Reinke and the Superior Court that the Bank, as Personal Representative, had engaged in self-dealing;  that it had purchased shares of the

Nations Funds for the Estate's account knowing that alternative investments could have been purchased for the Estate with higher investment yields with comparable safety;  that the Nations Funds prospectuses distributed to Plaintiff Reinke in connection with the Estate's accounts were false and misleading in material respects as set forth below and did not adequately disclose to her "the true direct and indirect expenses charged by Nations Funds"; that the Williams Plaintiffs had commenced litigation against the Bank making many of the Class-wide claims asserted herein,  as had other beneficiaries of the Bank's fiduciary accounts;  and certain of the other facts set forth below which had impacted negatively upon the assets in the Spencer Estate account. Thus, Plaintiff Reinke's acknowledged receipt of "all to which she is entitled from the Personal Representative" was induced fraudulently. As such, the discharge of the Personal Representatives is and was a nullity, as were all other similar releases and discharges obtained by the Bank from beneficiaries of fiduciary accounts and/or through "accountings" in probate courts and otherwise.

(b)     Plaintiff Robert Cohen is a citizen of the State of Missouri and is a beneficiary of an Individual Retirement Account (the "IRA") over which account the Bank has investment authority as a corporate fiduciary.

(c)     Plaintiffs H.Craig, Elinor Tama and Constance Elaine Williams (the "Williams Plaintiffs") are citizens of the States of Florida and Pennsylvania and are siblings who were beneficiaries of trusts set up by their father, Heberton F. Williams ("H.F.Williams") pursuant to the terms of the Last Will and Testament of H.F.Williams. The Bank, as the successor-in-interest to the original Trustee, was the principal Trustee of the Trusts established pursuant thereto (the "Williams Trusts"). The original Trustee was First National Bank and Trust Company of Jupiter/Tequesta which, in turn, was acquired by and merged into First Marine Bank

& Trust Company which, in turn, was acquired by and merged into Barnett Banks Trust Company, N.A. which, in turn, was acquired by and merged into Nations Bank, N.A., now known as Bank of America, N.A. following the acquisition of Bank of America National Association by and merger into Nations Bank, N.A.  At the outset, H.F. Williams wife, Jean, was the Co-Trustee with the Bank. The Williams Plaintiffs commenced a class action against the Bank and BAC in the Circuit Court of Palm Beach County in December 2002, Case Number 02-15454. BAC was dismissed as a defendant by the Court therein and such dismissal is the subject of an appeal. As such, the Williams Plaintiffs do not assert claims against BAC in this action. The remaining claims against the Bank were voluntarily dismissed by the Williams Plaintiffs in November 2005.

(d)     Plaintiffs George and Phyllis Siepel are citizens of the State of Illinois who are beneficiaries of the William J. Benstein and Agnes V. Benstein Residuary Trust ("Benstein Trust"), an Iowa trust of which United Central Bank of Des Moines, N.A., a corporate predecessor of the Bank, was Trustee.

(e)     Plaintiff Carl M. Page is a citizen of the State of Oregon who is a beneficiary of the Janet P. Wilson Trust, a New Mexico trust of which the Bank is Trustee through a Call Center.

27.     The Bank is a federally chartered bank domiciled in North Carolina, and is a wholly owned subsidiary of BAC also domiciled in North Carolina. BAC is a financial holding company, and the parent of the Bank.  At all relevant times, BAC dictated and controlled the business activities of the Bank, including, *inter alia*, the wrongful business activities described herein within the Eastern District of Missouri, and wherever in the United States the Bank, BAC and/or their respective predecessors conducted business.  BAC operates through subsidiaries,

22

including the Bank and the Bank Subsidiaries, Defendants CMA, BAI and BACAP, one or more of which are "financial advisors" and "investment companies" registered with the SEC under the 1940 Act and/or otherwise acting and holding themselves out to the public variously as "investment companies," "investment advisors" and/or "financial advisors." In addition, BAC and the Bank, through the Bank Subsidiaries and otherwise, are underwriters of the sale of Nations Funds shares sold to, *inter alia*, the fiduciary accounts of Plaintiffs and members of the Class. Although the Bank and BAC now have their principal places of business in Charlotte, NC, the Defendants conduct or conducted substantial business within this District in many locations through the "Private Bank," through retail branches of the Bank where the Defendants sell and distribute Nations Funds, through the Bank, various of its subsidiaries and otherwise. At all relevant times, Defendants BAC and the Bank were "control persons" of the Bank Subsidiaries, NFT and its Board of Trustees/Directors and BAC was a "control person" of the Bank.

28.     Defendant NFT, is the holding/operating entity the other Defendants formed to do business as and house the Nations Funds. Notwithstanding the fact that its principal place of business is and/or has been located variously in Little Rock, Wilmington, New York City and Charlotte, NFT has conducted business in this District through the Bank and the Bank Subsidiaries and otherwise through Bank-controlled brokers and dealers in securities. Although nominally independent and supervised by its Board of Trustees, as indicated above, Defendant NFT has at all relevant times been operated as an *alter ego* of the other Defendants and the Bank Subsidiaries. The framework of such relationship is based upon agreements such as the Investment Advisory Agreement- Nations Funds Trust executed on or about January 1, 2003 by and between NFT and BACAP and substantially similar earlier agreements of which Plaintiffs and the members of the Class were and/or are third-party beneficiaries. Similarly, NFT has

23

contracted with the Bank Subsidiaries to provide to it and to the Nations Funds investment advisory, administrative, distribution and other services,   the expenses of which were ultimately passed along and charged to the fiduciary accounts of Plaintiffs and the members of the Class. All the members of the Board of Trustees of NFT were selected and/or approved by BAC and/or its subsidiaries through the Bank's control of the NFT "election" process pursuant to which it votes all the Nations Funds shares held in its fiduciary accounts through proxies representing the majority of the shares outstanding. As a result of the fact that NFT is the issuer of Nations Funds shares sold to Plaintiffs (the Bank being merely an owner of record) and their fiduciary accounts and because it is an *alter ego* of the Bank, it has a direct relationship with each of the Plaintiffs and the members of the Class the functional equivalent of a fiduciary relationship. In carrying out its role as described herein, NFT and its Board provided substantial assistance to the Bank in its breaches of fiduciary duty as described herein.

29.     Defendant BAC (through its subsidiaries) and other business entities not owned by Defendant BAC, individually and collectively, charge substantial fees and expenses to the Nations Funds for their purported services which, together with NFT's own operating expenses, have had and continue to have a substantial cost to Plaintiffs' fiduciary accounts and each of the Bank's other fiduciary accounts, the assets of which have been invested in one or more of the Nations Funds, including Nations Funds money market mutual funds.

## FACTUAL ALLEGATIONS

30.     Notwithstanding the fact that the fiduciary accounts of members of the Class have been under the fiduciary responsibility of the Bank, it has bounced the beneficiaries of many of these accounts around the country, most significantly to the Bank's Call Centers in remote locations, which beneficiaries  are now "serviced" by low-level employees, rather than

24

fiduciary officers with knowledge of the beneficiaries or their individual needs, notwithstanding the following representations of Kenneth D. Lewis, Chairman and Chief Executive Officer of BAC and the Bank on November 3, 2003 in the context of a new acquisition of yet another bank, which claims are baseless and ring hollow:

> The people you know at your branch today will be there tomorrow, and will continue to strive to anticipate and meet your financial needs.

31.    Historically, the Bank and its predecessors invested the assets of the fiduciary accounts of members of the Class primarily through individually managed portfolios and/or through so-called "Common Trust Funds" or "Collective Investment Funds." The expenses of the Bank for such investment vehicles and related administrative services were absorbed by the Bank out of its fees for serving as fiduciary.

32.    Beginning some time prior to 1998, in order to, *inter alia*, compensate for massive losses it was incurring from its traditional lending business and the excessive premiums the Bank and BAC were paying for the Acquired Banks, the Bank and its predecessors developed various plans and schemes pursuant to which they sought to minimize their operating expenses with respect to fiduciary accounts and maximize their profits from their fiduciary business, particularly through the use of proprietary mutual funds as investment vehicles.

33.    Upon information and belief, former Bank Chief Executive  Officer Hugh McColl and incumbent Kenneth Lewis, were significant motivating forces behind these plans, which were integral to their master plan of extracting higher profits from the Acquired Banks and consolidating their various trust department and "wealth management" activities under the banner of the so-called "Private Bank."  Defendants' plan included the consolidation and elimination of the previously existing trust departments of the Acquired Banks with the objective

25

of "servicing" fiduciary accounts and the beneficiaries thereof with fewer and fewer personnel and greater standardization of investments in fiduciary accounts.  Pursuant to such business plans, they decided, *inter alia*, to utilize the assets held by the Bank in fiduciary accounts to fund an initial group of mutual funds and/or to add assets to such funds controlled by the Defendants and the Bank Subsidiaries, the Nations Funds, as well as other mutual funds merged into them following the acquisition of, *inter alia*, Fleet Bank.  Thereafter, due to numerous acquisitions, mergers and other transactions referred to above, consistent with their longer-term plan and scheme, the Defendants determined that most or all of the assets in certain fiduciary accounts held by the Bank (and formerly held as fiduciary assets by the Acquired Banks)  would be converted  into shares of the Bank's proprietary funds, such as the "family" of Nations Funds (or other of the Bank's proprietary mutual funds) or only invested in such mutual funds initially.

34.    Through a complicated and barely comprehensible grouping of advisors, sub-advisors, subsidiaries and other affiliated and unaffiliated service providers, the Defendants engineered a scheme pursuant to which the Bank was able to abdicate many of its traditional fiduciary responsibilities, functions and services to beneficiaries of its fiduciary accounts in favor of alternatives that resulted in higher total direct and indirect expense charges to the Bank's fiduciary accounts as compared to the trustee or similar fees historically paid to the Bank for, *inter alia*, active management of the fiduciary accounts' assets and to extract additional profits by utilizing the Nations Funds as compared to higher yielding and better-managed non-proprietary mutual funds that were commercially available in the marketplace.

35.    As indicated below, beginning some time prior to the commencement of the Class Period and continuing for some time thereafter, the Bank's "Private Bank" began sending out standardized form letters informing some co-trustees, beneficiaries of the fiduciary accounts

26

and others of the Bank's planned liquidation of its "Common Trust Funds" and touting the so-called "benefits" of the Conversions and certain mutual funds "reorganizations", which liquidations were carried out pursuant to carefully orchestrated plans nationwide based, in part, upon the level of integration of the previously Acquired Banks and other factors.

36.     All of these Conversions and reorganizations were carried out on a rolling basis and, although assets were held in individual accounts in various states, the Conversions did not differ from each other in any material way. A typical form letter, signed by David W. Fisher, President of the "Private Bank," also coerced the recipients of the letter to authorize the Conversion of the Trusts' assets into shares in the Nations Funds. In particular, the Bank's letter said:[4]

> Using Nations Funds, we can provide trust and fiduciary accounts with an attractive mix of investments to pursue the accounts' investment goals. Nations Funds also offer the benefits of:
>
> > Daily valuation and liquidity
> > Newspaper performance listings
> > Broader potential diversification
> >
> > Flexibility when making trust distributions

---

[4]  It is not presently known whether the Bank sent such a letter to beneficiaries of all of its fiduciary accounts (it appears that this was not the case) or, in the case of guardianships and similar accounts, to the appropriate courts overseeing such accounts. Further, not all co-fiduciaries received such a letter nor were their consents sought by the Bank. The Conversions carried out by Defendants did not differ in any material way for each fiduciary account regardless of its terms and the state in which the account was domiciled. Further, "trust officers" were required, pursuant to a carefully orchestrated plan, to convey the identical information to members of the Class and to similarly threaten them with adverse tax consequences and other "horrors" if they did not indicate their consents to the Conversions. Each such oral solicitation of consent to the Conversion misrepresented the Bank's reasons for carrying it out, concealed the conflicts of interest and the increased investment-related expenses that would be incurred by the Bank's fiduciary accounts post-Conversion and misrepresented that so-called "credits" that the Bank would thereafter apply to fiduciary accounts would be sufficient to compensate for all such additional expenses. Further, as with the prospectuses and other documents provided to beneficiaries and co-fiduciaries, the Bank concealed all the benefits it and its affiliates would derive from the Conversions, including those derived from "bulking-up" the Nations Funds and from utilizing the Nations Funds to benefit corporate customers of the Defendants at the expense of the holders of Nations Funds shares.

In fact, there was little, if any, benefit that would flow to beneficiaries of the Bank's fiduciary accounts and this letter was a sham.

      37.    Indeed, all such so-called "benefits," could have been accomplished by means of the Bank's "Common Trust Funds." Curiously, on or about August 16, 1999, the Bank announced that "Common Trust Funds will be valued at month-end instead of twice each month," despite the fact that computer software programs existed that could generate such valuations on a daily basis. The Bank's form letter used for its year 2000 Conversions went on to threaten coercively:

> Any common trust fund units for which we have not received an authorization [by May 1, 2000] may be liquidated and the proceeds placed in a money market vehicle pending discussion about reinvestment. This liquidation could have adverse tax consequences depending upon the cost basis of the common trust fund units.

      38.    Although not every member of the Class affected by the Conversions received documents seeking authorizations for the Conversions as well as Nations Funds prospectuses (that were made a part of registration statements filed by NFT or one of the Bank Subsidiaries covering the various offerings and sales of Nations Funds shares), in response to such coercion and the deceptive and unclear information provided by the Bank in the disclosure/authorization forms and accompanying prospectuses that were among the Conversion Disclosure Documents, co-trustees and beneficiaries of fiduciary accounts who received such forms, signed the enclosed forms, thereby providing to the Bank their uninformed and fraudulently induced "consent" to the Conversions.

      39.    Undisclosed to those who received the Conversion Disclosure Documents from the Bank, including the Nations Funds prospectuses therein, was the fact that, whether or not

consent was obtained, the Bank planned to proceed with the Conversions, that the Conversions were rife with self-dealing and conflicts of interest, that as a direct result of the Conversions, affected fiduciary accounts would end up paying materially higher investment-related expenses and the Defendants would reap substantial benefits therefrom.

40.     Enclosed with the Bank's form letters sent to  fiduciary account beneficiaries and/or co-fiduciaries were various Nations Funds prospectuses and other Conversion Disclosure Documents which were drafted so as to conceal, *inter alia*, the motives of the Bank and BAC for the Conversions into Nations Funds, the conflicts of interest between the Bank and members of the Class, the benefits of the Conversions to them and the Bank Subsidiaries and the materially increased expenses that would be incurred by the fiduciary accounts as a result of the Conversions.  Among the specific  material facts concealed  from the Conversion Disclosure Documents and the Nations Funds prospectuses included therewith are those increased expenses known by each of the Defendants to be absorbed by the Bank's fiduciary accounts as identified in, *inter alia*, Document #BOA_K+A 73193 produced in *Kutten* v. *Bank of America, N.A.,* Case No. 4:04-CV-244  (E. D. Mo.)(to which this case, upon commencement,  was designated as "related"), which documents would be quoted herein but for their improper designation in *Kutten* as "Confidential. Attorneys Eyes Only."

41.     Although the Nations Funds prospectuses and other of the Conversion Disclosure Documents issued during the Class Period in connection with the Conversions did disclose estimated or actual fees and expenses that would be charged to the Nations Funds, including fees and expenses paid by NFT and the Nations Funds to the Bank Subsidiaries, these prospectuses uniformly concealed that, in order to reduce the amount of "credits" or "fee waivers" that the Bank would apply to certain fiduciary accounts, re-allocations of various expenses were made to

29

benefit the Bank and Bank Subsidiaries and the expense of the fiduciary accounts affected by the Conversions.

42.     The Nations Funds prospectuses used by the Defendants for the Conversions and otherwise to sell Nations Funds shares to Plaintiffs and members of the Class also failed to disclose that, to the full extent that the Bank was using fiduciary assets to purchase shares in the Nations Funds, and thereby greatly increasing the asset bases of each of the affected funds, it and the Bank Subsidiaries were benefiting substantially by obtaining great operating efficiencies (and lower per-dollar invested expenses) as well as "bragging rights" which enabled the Bank to tout the amounts of assets in its mutual funds, making it easier to sell shares therein to, *inter alia*, other customers of the Bank and its brokerage subsidiaries.

43.     The Nations Funds prospectuses also failed to disclose that the contracts between NFT and the Bank Subsidiaries relating to the provision of investment advisory, administrative, distribution and other services were determined on a no-bid basis to benefit the Defendants and contrary to the best interests of Plaintiffs and the members of the Class.

44.     Each of the facts identified above and others were material facts that the Defendants should have disclosed in the foregoing Nations Funds prospectuses and in the other documents provided to the beneficiaries of the Bank's fiduciary accounts at the times of the Conversion and generally when they were selling to such accounts shares of the Nations Funds as underwriters, financial advisers, investment companies, broker/dealers and otherwise.

45.     There was no explanation in plain English that would put the recipients of the Conversion Disclosure Documents on notice of the Bank's wrongdoing as referred to herein. In fact, one of those documents, (Form 3.05D 7/1999) entitled "Disclosure of Investment in Nations Funds," stated deceptively: