> The fee paid directly by the [Trust] Account to the Bank will be reduced (but not below zero) by the Account's pro rata share of the investment advisory fees paid by the Funds to the Service Providers; provided however, that the amount of the reduction will be based on Bank of America Corporation's percentage ownership of the Service Provider. From time to time, the Bank may elect to reduce the Account's fees in recognition of amounts paid by Nations Funds for other services (such as administrative services), but it is not obligated to do so, and the amount of any such fee reduction may vary. The Account will not be charged a sales "load" for buying or redeeming Fund shares described in the accompanying prospectuses.

Such doubletalk-laden form went on to state:

> I acknowledge receipt of the current prospectuses for the Funds and a Nations Funds Fee Disclosure Statement. As co-fiduciary for this account, I understand that the Service Providers will be paid investment advisory and other fees by the Funds. **I approve the method for reducing the investment management fees paid to the Bank by the Account**. I understand and agree that the Bank may choose not to reduce the Account's fee on the account of the compensation paid by the Funds for other services, but the Bank is electing to do so at this time. [Emphasis added].

46.    In fact, the Bank and the lawyers who drafted these documents, including lawyers for Defendant NFT, used such language to conceal the fact that although in many cases there was a credit for certain of the post-Conversion investment advisory fees to be incurred by fiduciary accounts, the credits were insufficient to offset the substantially higher expenses that fiduciary accounts would bear post-Conversion and that the Bank intended to reduce or eliminate the credit as soon as practicable thereafter once consents were obtained and/or the Conversions completed.

47.    Further, in many other cases, there was no credit for the fiduciary fees charged by the Bank and thus the Bank was able to fully "double dip," charging fees to serve as a corporate

31

fiduciary and, as well, imposing substantial fees and expenses on the Nations Funds acquired for the affected fiduciary accounts.

48.     Despite the outward appearance of independence of NFT and its legal counsel, who may have performed or been involved with the physical tasks of "drafting" them, the content of the Nations Funds prospectuses was effectively dictated by BAC, the Bank and the Bank Subsidiaries. Indeed, with respect to the Nations Funds prospectuses used by the Defendants for the Conversions, which prospectuses were substantially identical to those used to sell Nations Funds shares generally, Robert Hitpas, a Senior Vice President of the Bank as well as one who was responsible for overseeing numerous fiduciary accounts, found them daunting, full of legalese, fine print and difficult to read. Another Bank Senior Vice President, Paula Hundt, who had responsibility for dealing with the Williams Plaintiffs' accounts, reacted similarly and it is believed that many, if not most of the Bank's "trust officers" could not understand many of the material terms of the Conversion and what was set forth in the prospectuses of the Nations Funds provided to beneficiaries of fiduciary accounts in connection therewith or otherwise.

49.   (a)   Apparently as a result of an agreement among the Defendants and the senior officers of the Bank Subsidiaries, concealed from the Nations Funds prospectuses, there was no credit for many of the substantial operating expenses of the Nations Funds, which substantially reduced the net investment returns to fiduciary accounts. At no place in any of the Nations Funds prospectuses disseminated by the Defendants to beneficiaries of fiduciary accounts and to co-fiduciaries in connection with the Conversions did they disclose that, post-Conversion, all fiduciary accounts affected by the Conversions would be forced to bear substantially higher investment-related expense levels post-Conversion than those which preceded it, even allowing

32

for whatever credits the Bank applied to its fees for serving as fiduciary. See, e.g. the Bank's documents identified in ¶40, above.

(b)  The Nations Funds prospectuses disseminated in connection with the Conversions during the Class Period failed to disclose that the Defendants had obtained the approval of the SEC for the Conversions based upon false pretenses; i.e. that the parties thereto would not engage in "overreaching" and the consideration paid for Nations Funds shares in connection therewith would be "reasonable." *In re Nations Funds Trust et al,* Investment Company Act Release 24373, 2000 SEC LEXIS 610 (Mar. 31, 2000)  In fact, each of the Defendants "overreached" by imposing upon the fiduciary accounts for which the Nations Funds shares were being purchased excessive and unnecessary charges in Defendants' self-interest. Indeed, had the SEC been informed that the expenses of maintaining fiduciary accounts would rise materially in the wake of the year 2000 and later Conversions without any concomitant benefits to the beneficiaries of the affected accounts, it would not have concluded that the Conversions were "appropriate in the public interest and consistent with the protection of investors and the purposes fairly intended by the policy and provisions of the [1940]Act."

(c)  Similarly concealed by them was the fact that Defendants re-allocated certain expenses incurred by the Nations Funds so that they would not be subject to the "credits" and thus directly borne by the affected fiduciary accounts.  Indeed, upon information and belief, many of such credits, to the extent given, have now been substantially reduced on a nationwide basis.

(d)  The Nations Funds prospectuses, in disclosing that one or more of the Bank Subsidiaries were responsible for the overall management and supervision of the investment management of each of the Nations Funds failed to disclose that the fees therefore were

33

excessive and, to the extent sub-advisors were engaged to be responsible for the day-to-day investment decisions of particular Nations Funds, the aggregate investment advisory fees paid were excessive and duplicative.

(e)  The Nations Funds prospectuses failed to disclose that despite the beneficial ownership of the Nations Funds shares being bought for their fiduciary accounts, the Bank would retain for itself all voting rights with respect to such shares and would vote such shares in the interests of the Defendants and not the interests of the beneficiaries thereof.

50.    Upon information and belief, despite their ability to dictate the content of the Nations Funds prospectuses, at no time following the foregoing "disclosures" or at any other time during the Class Period did the Bank, BAC, NFT or the Bank Subsidiaries make any complete and candid disclosure of the full extent of the damages caused to the fiduciary accounts by the Conversions or other improper investments of fiduciary assets in the Bank's proprietary funds or the Bank's conflicts of interest with respect thereto.  Further, the Defendants made no disclosure of the true motives of the Defendants in carrying out the Conversions or the full extent to which they were profiting unjustly therefrom and, in particular, the additional assets which would flow into the Nations Funds and other proprietary mutual funds, making them more saleable to the investing public generally.

51.    Even after the Bank applied a so-called credit against its fees for some portion of the advisory and administrative fees charged to some of the Nations Funds to some fiduciary accounts, in practical terms, it was (and is) impossible for co-fiduciaries, beneficiaries and others to understand and have knowledge of the true cost of ownership of Nations Funds to the fiduciary accounts and the income earned upon their assets.  Indeed, Class members have sought to obtain such information or other similar information relating to the expenses of investing the

34

assets of fiduciary accounts in the Nations Funds from the Bank and have never received "straight" or any answers to their questions with respect thereto and have received misleading or downright deceptive information as to the impact of such investments upon them and their fiduciary accounts.

52.     Significantly, at no time did the foregoing "disclosure" documents disclose clearly to a co-fiduciary, a beneficiary or other person interested in the affected fiduciary accounts the true additional direct and indirect expenses of the Conversions (although many of such "disclosures" were buried in the Nations Fund prospectuses) nor, in fulfillment of the Bank's fiduciary responsibilities, did the Bank make any personal efforts to insure that Plaintiffs or others similarly situated understood the extent to which the Bank, BAC, their subsidiaries and affiliates would benefit from the Conversions and how the Bank's fiduciary accounts would end up paying substantially more for the investment and related services that the Bank had historically supplied in partial consideration for the Bank's trustee and similar fees. Indeed, Mr. Fisher's letter of August 31, 2000 sent to beneficiaries of fiduciary accounts transmitting Nations Funds prospectuses was purportedly "for information" only and recipients, including Plaintiffs, were told: "**you do not need to take any action.**" [Emphasis in original].

53.     The Bank did not disclose to affected beneficiaries that the Conversions would produce premature capital gains tax liability. In fact, to the contrary, the Bank advised the beneficiaries of its fiduciary accounts and other interested parties that there would no capital gain consequences as a result of the Conversions of the Common Trust Funds into the Nations Funds. The Bank did not disclose that the Conversions would result in material increases in the fees and expenses  being absorbed by fiduciary accounts as a result of investments the Bank's investments in the Nations Funds as set forth more fully in, *inter alia*, the Bank's documents identified in

35

¶40, above..  To the contrary, the Bank advised affected beneficiaries of such accounts and others of the expense ratio for the different Nations Funds as well as unintelligible information on fee credits, but never advised the beneficiaries that they and their fiduciary accounts would pay more for Nations Funds investments than they had paid pre-Conversion.  The Bank and the other Defendants were aware and failed to disclose that the expenses of the Conversions of assets to the fiduciary accounts would be substantial. Given the growth of the Nations Funds' assets in the hundreds of billions of dollars, most of which comes from the Bank's fiduciary accounts and the number of years the Bank has extracted these excess fees and expenses from the fiduciary accounts, the Plaintiffs and Class-wide damages are quite substantial.

54.     The intentional wrongdoing and misconduct toward the beneficiaries of the Bank's fiduciary accounts is apparent from the conflict of interest of the Chairman of its Investment Policy Committee ("IPC") (the Bank committee making decisions on the suitability of investments for fiduciary accounts by the Bank and whether to invest in Nations Funds). Owen Shell, a former senior executive of the "Private Bank", testified that Mr. Galt, the Chairman of the IPC in 1999 was also providing advisory services to the Nations Funds.  In other words, he was serving two masters.  He worked for Nations Funds and/or NFT and had an interest in getting investments in the Nations Funds approved by the IPC while he was the Chair. This conflict was never disclosed to the Bank's beneficiaries in any of the Nations Funds prospectuses issued during the Class Period or in any other written form.

55.     Upon information and belief, no analyses or determinations were made by the Bank as to the suitability and/or propriety of the relative costs and benefits of investments in the Nations Funds at the time of or before the Conversions were carried out for each of the Bank's fiduciary accounts as compared to pre-Conversion investments including, *inter alia*, any

36

comparisons with numerous other available mutual funds or investment vehicles in which the Bank could have invested prudently and at lower cost the assets in the fiduciary accounts of which Plaintiffs and the members of the Class were beneficiaries.

56.     Even assuming that the Bank made a prudent decisions to purchase shares in the Nations Funds for fiduciary accounts, which it did not, as indicated above, the Bank did not negotiate the fees and expenses to be charged to the Nations Funds or comparison shop in any significant way with other funds or families of funds in an attempt to obtain the same or better investments elsewhere and at lower net expense to its fiduciary accounts. Upon information and belief, any "comparisons" that were done by the Bank with non-proprietary mutual funds or investment advisors were merely to "paper" the Bank's files so it would appear that an effort was made to consider alternative mutual funds or advisors. Similarly, neither NFT nor its Board of Trustees, sought to obtain the lowest fees from the Bank Subsidiaries actually operating the Nations Funds. Indeed, as stated by New York's Attorney General Eliot Spitzer: "Fund directors do not – and cannot – negotiate hard on the fees." This is particularly the case when, as here, all of NFT's Trustees were nominated and voted upon by the Bank, which totally controlled the composition of NFT's Board and, thus, NFT. As such, NFT and the entire Board of Trustees of NFT, aided and abetted by the other Defendants, breached the fiduciary duties owed to Plaintiffs and the members of the Class and, by reason of their knowledge of the Defendants' motives for the Conversions, were themselves *de facto* fiduciaries. Further, by their control of NFT and the Bank Subsidiaries, the Bank, as an underwriter of the sale of Nations Funds shares to or for the benefit of Plaintiffs and the members of the Siepel Plaintiffs and members of the Federal Securities Law Sub-Class defined below, caused false and misleading Nations Funds

prospectuses to be disseminated in connection with the offering and sale of Nations Funds shares as described herein.

57.     Upon information and belief,  the Bank specifically excluded alternate investment vehicles (such as other families of funds such as the Vanguard and Fidelity mutual funds specifically requested by some beneficiaries of fiduciary accounts) from its considerations in order to maximize its earnings and those of its affiliates (including the Bank Subsidiaries) and did not give serious consideration to leaving the assets of fiduciary accounts invested as they were, pre-Conversion, and/or giving beneficiaries of such accounts a choice as to the various alternatives available, such as were sought by, *inter alia*, Judge Medler. Similarly, at no time did the Bank give any consideration to making changes in the Bank's "Common Trust Funds" so as to provide any of the purported "benefits" that the Bank claimed would be forthcoming as a result of the Conversions.  The requests of  beneficiaries of the Bank's fiduciary accounts for changes in investments were repeatedly rebuffed. [5][Steve-Modify **footnote to eliminate EJK]**

58.     On information and belief, as a result of a conspiracy among the Defendants and others presently unknown, the Bank, as part of a corporate business decision, chose to invest the fiduciary assets of Plaintiffs and the members of the Class in shares of the Nations Funds as part of the Conversions and otherwise in order, *inter alia*, to generate investment advisory fees and other fees for its various affiliates and to "bulk-up" the Nations Funds without regard to whether such investments were prudent and in the best interest of Plaintiffs and the other beneficiaries of fiduciary accounts.

59.     The Conversions of the assets of fiduciary accounts to the Nations Funds and the investment of fiduciary assets therein generally was carried out in furtherance of the corporate

plan of BAC and the Bank to reduce the Bank's expenses of managing fiduciary assets and increasing BAC's overall direct and indirect profits from fiduciary operations, one of its objectives in consolidating the operations of the Acquired Banks. The assets in the fiduciary accounts managed by the Bank were particularly vulnerable to misuse since BAC and the Bank regarded the fiduciary accounts in the Bank's care as a "cookie jar" open for the taking. The Bank proceeded to carry out the Conversions since it and BAC would not merely profit from the Bank's trustee and similar fiduciary fees but "double dip" by generating additional revenues through the Defendants' related asset management businesses, administrative service businesses and otherwise. Further, the Conversion created an opportunity for the Bank to avoid the relatively low profitability of managing the fiduciary accounts (and the expenses related thereto) which the Bank had contracted to do when it (and/or its predecessor Acquired Banks) agreed to serve as fiduciary thereof, and substitute ever-increasing fee income directly and through its corporate affiliates.

       60.    The Bank and its affiliates reaped many millions of dollars in purported money management, investment advisory and other fees as a result of the Conversions and thereafter from the investment of fiduciary assets in the Nations Funds. The Bank also benefited by receiving trustee or similar fees for serving as a fiduciary and by reason of the benefits which flowed from, *inter alia*, substantially reduced operating expenses of the Bank's fiduciary operations. Despite these benefits to the Bank and its affiliates, these investments have been of little, if any, benefit for the Bank's fiduciary accounts and the beneficiaries thereof, including Plaintiffs and the members of the Class. On information and belief, Plaintiffs and all members of the Class suffered damages from the investment practices of the Bank as described above in an

---

[5] Plaintiff Kutten and Judge Medler, although nominally Co-Trustees with the Bank, were typically ignored in their

amount which cannot presently be determined but which is capable of calculation and they are entitled to restitution of the Defendants' unjust enrichment as described below.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action on their own behalf and pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure as a class action on behalf of the following Class:

"all beneficiaries, owners, beneficial owners, or principals of trusts, accounts or other entities for which the Bank or any of its parents, subsidiaries, affiliates, predecessors, successors or assigns acted as a trustee, fiduciary or agent and that were directly or indirectly invested in Nations Funds Mutual Funds at any time from September 8, 1998" to the present, (the "Class" and "Class Period").

62.     The Class defined above has already been stipulated to by each of the Defendants, their affiliates and others in connection with the settlement of certain related claims against them in *In re Mutual Funds Investment Litigation*, MDL-1586, where it was designated as a "Fiduciary Sub-Class." Those members of the Class who were directly or indirectly invested in Nations Funds in connection with one or more of the Conversions are referred to herein as the "Conversions Sub-Class."

63.     Over the past 15 years, BAC and the Bank, while making acquisitions around the country increasingly consolidated their operations and centralized them into a nationwide template consistent with the goals and objectives set out by Messrs. McColl, Lewis and Hance affecting all members of the Class herein in substantively the same way.

As observed in the April 20, 1998 issue of the <u>San Francisco Business Journal</u>:

With the acquisition of BankAmerica, NationsBank, CEO Hugh McColl Jr. has finally realized his manifest destiny, a decade-long quest to build a coast-to-coast bank.

\*          \*          \*

---

roles as such.

40

NationsBank will superimpose its corporate culture, computer systems and practices onto Bank of America."

&ast;  &ast;  &ast;

McColl discussed the issue of major American cities losing their hometown bank in a recent address in St. Louis, which lost its Boatmen's Bancshares to the Charlottean. with the headquarters of a major bank or financial institution,' McColl said. 'That's one of the realities of the market forces driving consolidation in our industry.'

&ast;  &ast;  &ast;

'NationsBank has spent a great deal of time and effort over the last six years putting in a common platform of systems across its entire franchise,' said James Hance Jr., vice chairman and chief financial officer at NationsBank. 'We would expect to expand those systems across the entire BankAmerica franchise.'

**A determined McColl defended the move at a San  Francisco news conference, saying, 'It's good for our associates, it's good for our customers and it's good for our shareholders.'**

**McColl recently told his shareholders that 'creating a single company is important from cost and efficiency standpoints, and it pays off for our customers in convenience and ease of doing business.        [Emphasis added]**

64. The Class as defined herein was effectively envisioned by Hugh McColl when he

said at the April 28, 1999  Annual Meeting of BAC's shareholders:

The Model Bank [of Bank of America] is a system that brings together a nationwide, integrated technology platform with company-wide products and services, providing bank associates with complete information about customer relationships across product lines, business lines and geographic lines. **The single system enables us to roll out new products and services simultaneously to all our customers throughout the country with ease and consistency. It enables us to communicate with customers and on behalf of customers throughout the system. It enables us to provide customers with uniformity of product, service and experience, no matter where they are ......**the creation of a single, nationwide bank charter…will also enable us to eliminate redundant and costly administrative functions."

[Emphasis added]

65. Plaintiffs seek, *inter alia*: (i) an accounting which determines all damages caused

by Defendants to the members of the Class defined below and the extent of the unjust enrichment

of the Defendants from their wrongful activities, as well as repayment of such unjust enrichment and the earnings thereupon;  (ii) money damages to be paid by the Defendants; (iii) injunctive relief providing for the possible removal of the Bank as fiduciary for all fiduciary accounts in which members of the Class are currently beneficiaries; (iv) injunctive relief providing for new procedures and practices at the Bank which put the interests of  members of the Class ahead of those of Defendants and which otherwise address the ongoing conflicts of interest forced by the Bank in the investment of fiduciary assets including, *inter alia*, providing for the creation of a so-called "Chinese Wall" separating the Bank's fiduciary functions from all other operations; (v) injunctive relief providing for NFT,  the Nations Funds and other of the Bank's proprietary mutual funds to annually select investment advisors chosen based upon, *inter alia*, comparative investment performance and expense; (vi) injunctive relief providing for the appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court; and (vii) for relief  incident and subordinate thereto, including substantial punitive damages as a result of the greed-driven and egregious self-dealing engaged in by Defendants.

## Numerosity of the Members of the Class

66.     Upon information and belief, the Bank serves as a fiduciary (such as a trustee, guardian, executor, etc.) for many thousands of fiduciary accounts affected by the wrongdoing described herein.

67.     The Federal Securities Law Sub-Class consists of those members of the Class for whom the Bank ( as owner of record but not beneficially) purchased for their fiduciary accounts shares of the Nations Funds within the limitations periods applicable to the federal claims asserted herein. The Missouri Sub-Class consists of those members of the Class whose fiduciary

42

accounts originated in and/or affected beneficiaries in the State of Missouri. The Washington Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Washington. The Florida Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Florida.  The New Mexico Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of New Mexico. The Iowa Sub-Class consists of those members of the Class whose fiduciary accounts originated in and/or affected beneficiaries in the State of Iowa.  Such definitions are subject to modification upon completion of discovery with respect thereto.

68.     The exact number of members of the Class and the Sub-Classes as above described is not known by Plaintiffs, but is within the sole knowledge of the Bank. Upon information and belief, the members of the Class and Sub-Classes are so numerous as to make a Class Action appropriate with each such Sub-Class being composed of hundreds or thousands of members.

69.     On information and belief, the members of the Class, the Conversions Sub-Class and the Federal Securities Law Sub-Class are located in most or all fifty states, and in numerous foreign countries.

70.     Upon information and belief, while the members of the  state Sub-Classes are concentrated in the states of Missouri, Florida, Iowa, New Mexico and Washington, respectively, they are similarly scattered around the country and elsewhere.

### Common Issues of Law and Fact Predominate

71.     On information and belief, at least two years prior to the Conversions, the Bank, in conspiracy with the other Defendants and others, decided to invest the assets of the affected

43

fiduciary accounts in shares of the Nations Funds and other proprietary mutual funds, all of which were directly or indirectly "advised," managed and otherwise administered by the Bank Subsidiaries or their affiliates. Such investments for fiduciary accounts were carried out directly or through the Conversions. Such Conversions were carried out nationwide on a rolling basis as an integral part of the consolidations by BAC and the Bank with the Acquired Banks subject to a master plan developed by them, Messrs. McColl, Hance and Lewis and others. None of such separate Conversions differed materially despite the timing and different Acquired Banks of each. Upon information and belief, the Conversions were approved and set into motion by the same committees of the Bank's Board of Directors, which included Messrs. McColl, Hance and Lewis and the administrative aspects of each of the Conversions were carried out by substantially the same group of employees of the Bank using common form documents, guidelines and operating methodology. Similarly, separate and apart from the formal Conversions, pursuant to directives from senior executives of the Bank, fiduciary assets were increasingly channeled into the Bank's proprietary mutual funds including Nations Funds money market funds, typically without any material disclosures made to the beneficiaries of the affected accounts.

72.     All members of the Class and the Sub-Classes were adversely affected by the self-serving business decision of BAC and the Bank to invest the fiduciary account assets within the Bank's control into shares of the Nations Funds pursuant to the Conversions and/or in their proprietary mutual funds thereafter and/or otherwise invest fiduciary assets therein.

73.     All of the Bank's fiduciary accounts and their beneficiaries were negatively impacted by the acquisitions of other financial institutions as described above. Among the material consequences thereof was the substantial reduction in the fiduciary services provided to the members of the Class and, in the wake thereof, the Conversions. All of the Bank's fiduciary

44

accounts, the assets of which were invested in shares of the Nations Funds and others of the Bank's proprietary funds, paid directly or indirectly, administrative and investment advisory fees and other charges to subsidiaries and affiliates of the Bank, including the Bank Subsidiaries, based on the fiduciary assets invested by the Bank in such mutual funds. All fiduciary accounts of which the Bank was corporate fiduciary were damaged  by reason of the higher expenses charged to such accounts as a consequence of the Conversions and the lower investment returns generated as a result thereof and/or by investments in the Nations Funds unrelated to the Conversions. Those members of the Class not affected by the Conversions but whose assets were nevertheless invested in shares of the Nations Funds were similarly damaged as a result of such purchases.

74.     There are common questions of law and fact that relate to and affect the rights of each member of the Class including, *inter alia*:

(a)     whether the Bank's business decision to invest assets of the fiduciary accounts in the Nations Funds and other proprietary funds was motivated by the best interests of the Class members (which the Bank had a duty to put before its own) or by its desire to generate management and investment advisory fees for itself, its affiliates and subsidiaries, to lower the Bank's expenses of managing  fiduciary assets and to generate other benefits for themselves and NFT by, *inter alia*, "bulking-up" the assets invested in the Bank's proprietary funds;

(b)     whether the Bank breached fiduciary and contractual duties to Plaintiffs and the Class by failing to conduct its fiduciary operations in conformity with the requirements of the National Banking Act, the guidelines established by the Comptroller of the Currency and other applicable law and regulations and whether the other Defendants aided and abetted such breaches;

45

(c)      whether the Bank breached its fiduciary and contractual duties to all members of the Class by making investment decisions for the fiduciary accounts of Plaintiffs and the Class based upon Defendants' own interests and those of their affiliates, rather than the interests of the beneficiaries of such fiduciary accounts and whether the other Defendants aided and abetted such breaches; and,

(d)      what remedies are appropriate compensation for the damages caused to Plaintiffs and each member of the Class.

75.      The relief sought is common to the entire Class including, *inter alia:*

(a)      a declaratory judgment that the Bank violated its fiduciary duty as Trustee (or other similar fiduciary role) with respect to the affected fiduciary accounts and whether it was aided and abetted by the other Defendants  and others in doing so;

(b)      payment by the Defendants of compensatory damages caused by their commission of and/or aiding and abetting breaches of fiduciary and contractual duties,  as well as substantial punitive damages;

(c)      an injunction preventing the Bank from opposing a petition by current beneficiaries of the fiduciary accounts affected by the Conversions or other wrongdoing referred to herein to replace it as corporate fiduciary; and

(d)      an injunction which establishes appropriate procedures and safeguards within the Bank and with respect to the operation of NFT to ensure that the interests of beneficiaries of fiduciary accounts within the Bank's control are fully protected from wrongdoing such as described herein.

**Typicality and Predominance of Plaintiffs' Claims**

46

76.     The interests of each of the Plaintiffs and each member of the Class have been adversely affected by the wrongdoing of the Defendants as described herein.

77.     The assets of the respective Plaintiffs' fiduciary accounts, like all other fiduciary accounts of members of the Class, were invested by the Bank in shares of its proprietary mutual funds pursuant to a wholesale business policy decision by BAC and the Bank at the behest and encouragement of Messrs. McColl, Hance and Lewis and/or their subordinates made some time prior to the beginning of the Class Period and carried out by the Bank thereafter pursuant to the Conversions and otherwise.

78.     Upon information and belief, the Plaintiffs' respective fiduciary accounts, like all other fiduciary accounts, was used by the Bank, the other Defendants and their affiliates to generate additional management, investment advisory and/or other fees and benefits for themselves (even after the so-called credits were applied to the Bank's fiduciary accounts as a result of certain Nations Funds fees being paid to the Bank and Bank Subsidiaries) without regard for the best interests of the beneficiaries of such accounts such as Plaintiffs and the members of the Class. These claims that Plaintiffs have in common with all members of the Class predominate over any individual claims they have against the Defendants.

79.     The claims of Plaintiffs, who are representatives of the Class and the Sub-Classes, respectively, are typical of the claims of all members thereof. The claims of Plaintiffs are based on the same fundamental factual allegations and legal theories as the claims of all other members of the Class and the Sub-Classes.

**Plaintiffs Will Fairly and Adequately Represent the Class and the Sub-Classes**

80.     The Plaintiffs are able to and will fairly and adequately protect the interests of the Class, the Sub-Classes and the members thereof.

47

81.    The attorneys for Plaintiffs are experienced and capable of prosecuting complex litigation such as this case. The attorneys for Plaintiffs and the Class will actively conduct and be responsible for the prosecution of this litigation and the expenses thereof.

## PLAINTIFFS' ENTITLEMENT TO PUNITIVE DAMAGES

82.    The conduct of the Defendants was outrageous because of their fraud, malice, evil motive and reckless indifference to the rights of the Plaintiffs and all others similarly situated in implementing a nationwide across the board policy to convert assets in the fiduciary accounts from other investments to the Nations Funds in that defendants :

(a)    deliberately and knowingly withheld and concealed material information to the beneficiaries and/or grantors of the accounts relating to conflicts of interest and the increased costs and expenses they would incur as a result of the Conversion, which costs and expenses inured to the benefit of the Bank in flagrant violation of the Bank's duty of loyalty;

(b)    deliberately and knowingly changed the investment vehicles historically used by trust companies for investments of fiduciary assets to the Nations Funds, specifically to generate revenues and profits at the expense of the beneficiaries of the fiduciary accounts in flagrant violation of the Bank's duties of loyalty and prudence;

(c)    deliberately and knowingly failed to properly disclose to beneficiaries and/or grantors of the fiduciary accounts the method of the application of fee credits to their accounts to offset the additional cost of Nations Funds investments in flagrant violation of the Bank's duties of loyalty and prudence;

(d)    deliberately and knowingly withheld information that the beneficiaries/grantors would incur a capital gains tax in connection with the Conversions and/or

48

the reorganizations of mutual funds within the Nations Funds while the Bank would suffer no adverse tax consequence in flagrant violation of the Bank's duties of loyalty and prudence;

(e)     deliberately and knowingly engaged in conflict of interest and self dealing transactions and failed to consider whether this conduct was in the sole interests of the beneficiaries/grantors of the fiduciary accounts to whom the Bank owed a fiduciary duty, including the duties of loyalty and prudence and instead, put their interest in generating  revenues and profits for the Bank ahead of those to whom they owed a fiduciary duty;

(f)     knowingly and intentionally or as a result of gross negligence concealed from the Bank Committee which approved the conversions true facts relating to the true expense to be borne by the fiduciary accounts for the conversions by performing accurate comparisons of the expense ratios of Nations Funds mutual funds with other comparable funds in the marketplace.

## COUNT ONE

## THE 1940 ACT

.    83.    The Siepel Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

84. 15 U.S.C. § 80B-6 (prohibited transaction by investment advisers) provides in relevant part:

It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(1)     to employ any device, scheme, or artifice to defraud any client or prospective client;

(2)     to engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client;

***

49

(4)     to engage in any act practice, or course of business which is fraudulent, deceptive or manipulative."

85.     The Act reflects a congressional intent to eliminate or at least to expose, all conflicts of interest which might include an investment adviser -- consciously or subconsciously--to render advice which was not disinterested. *See SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 191-192 (1963).  As advisers registered with the SEC or who otherwise hold themselves out as such, the Bank and Bank Subsidiaries are bound by a fiduciary duty to each member of the Federal Securities Sub-Class  as the beneficiaries of the contractual arrangements between the Bank and those who purchased financial services from the Bank.  The Siepel Plaintiffs allege that the Bank and the Bank Subsidiaries were bound by that fiduciary duty on a Class-wide basis and breached that duty on a Class-wide basis.

86.     Pursuant to the 1940 Act, the Bank and Bank Subsidiaries were bound by a legally imposed fiduciary duty to act in the best interests of the Siepel Plaintiffs and the members of the Federal Securities Law Sub-Class. The Bank and Bank Subsidiaries owed the Siepel Plaintiffs and the Class represented by them a duty to act fairly and in their best interests and to ensure that full, honest and adequate disclosure was made to them in connection with their respective relationships with, *inter alia*, the Bank and the Bank Subsidiaries..

87.     Instead, the Bank and the Bank Subsidiaries breached their respective duties by failing to disclose material information to the Siepel Plaintiffs and the members of the Federal Securities Law Sub-Class and operated a scheme and course of business to cause the investment of Nations Funds shares for their fiduciary accounts. By this conduct, the Bank and the Bank Subsidiaries affirmatively breached their duties and conducted their business in a manner that

50

operated as a fraud and deceit upon the Siepel Plaintiffs and the members of the Federal Securities Law Sub-Class.

88. As a result of the plan and scheme described herein, the Siepel Plaintiffs and members of the Federal Securities Law Sub-Class, who were the victims of this scheme, were damaged and entitled to a damages, including restitution and recovery of all fees paid in connection therewith. See *Morris v. Wachovia Securities, Inc.*, 277 F. Supp. 2d 622, 642-645. (E.D. Va. 2003).

## COUNT TWO
## THE EXCHANGE ACT

89. The Siepel Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

90. As described above, the Defendants caused the dissemination of false and misleading Nations Funds prospectuses and other documents which concealed material facts and misrepresented other material facts in connection with the purchase of Nations Funds shares by and for the Siepel Plaintiffs and the members of the Federal Securities Law Sub-Class. The Bank and BAC dominated and controlled each of the other Defendants, which were "controlled persons" under and pursuant to §20 of the Exchange Act. As such, the Bank and BAC were responsible for the statements made by or in the name of each of the other Defendants as described above.

91. As a result thereof, and the manipulative scheme of which the issuance and dissemination of such documents was an integral part, the Bank caused Nations Funds shares to be purchased for the benefit of the Siepel Plaintiffs and for the members of the Federal Securities Law Sub-Class, all of which was in violation of §10b(5) of the Exchange Act and Rule 10b-5

promulgated thereunder by the SEC, all of which caused them damages in an amount which cannot presently be determined.

## COUNT III

## THE SECURITIES ACT

92.     The Siepel Plaintiffs reassert and reallege each and every allegation set forth in the paragraphs above as if stated herein.

93.     As described above, the Defendants caused NFT Registration Statements on Form N-1A and Post-Effective Amendments thereof to be filed with the SEC which contained, *inter alia,* Nations Funds prospectuses which were disseminated to the Siepel Plaintiffs and the members of the Federal Securities Law Sub-Class, which prospectuses misrepresented material facts and omitted other material facts as described above. The Bank and BAC dominated and controlled each of the other Defendants as well as the Trustees of NFT who were the signatories to the foregoing SEC filings,  all of which were  "controlled persons" under and pursuant to §15 of the Securities Act. As such, the Bank and BAC were responsible for the statements made by or in the name of each of the other Defendants and the Trustees of NFT as described above.

94.     As a result thereof, and the scheme of which the issuance and filing with the SEC of the foregoing NFT Registration Statements and Post-Effective Amendments thereto were an integral part, the Defendants caused Nations Funds shares to be issued and sold to the Siepel Plaintiffs' fiduciary account and those of the members of the Federal Securities Law Sub-Class, all of which was in violation of §§ 11 and 12 of the Securities Act, all of which caused them damages in an amount which cannot presently be determined.

## COUNT III

52

**BREACH OF FIDUCIARY DUTY**

95.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted by all Plaintiffs on behalf of the Class and the Conversions Sub-Class.

96.     On information and belief, the Bank's decision to invest the assets of its fiduciary accounts in the Nations Funds was motivated not by the interests of Plaintiffs and the Class members but by their own interests in generating additional profits for themselves. In making the Class-wide decision to purchase its proprietary mutual funds for its fiduciary accounts, the Bank failed to consider the Nations Funds' high expenses or alternative lower cost families of mutual funds (or deliberately did not do so) when it invested the assets of its fiduciary accounts in. shares of the Nations Funds. The Bank simply put its own interests and those of the Bank Subsidiaries and its affiliates before those of the beneficiaries of its fiduciary accounts.

97.     The Bank failed to consider the best interests of these beneficiaries when it invested the assets of fiduciary accounts in the Nations Funds and breached its duty of loyalty to them by putting the interests of itself, the Bank Subsidiaries and its affiliates before the interests of Plaintiffs and the members of the Class and the Conversions Sub-Class.

98.     The Bank's wholesale investment of the assets of the affected fiduciary accounts in the Nations Funds pursuant to the Conversions or as a result of direct purchases of Nations Funds shares for fiduciary accounts was a breach of its fiduciary duty to Plaintiffs and the members of the Class and Conversions Sub-Class, which breach was aided, abetted and/or directed by each of the other Defendants. Indeed, each of the other Defendants knew or should have known of the Bank's breach of fiduciary duty as described herein inasmuch as each of them

53

provided substantial assistance in connection with the Conversions and the sale of Nations Funds to the Bank's fiduciary accounts generally.

99.     As a result of, *inter alia*, the Bank's improper wholesale transfer of the assets held by the Bank's fiduciary accounts into shares of the Nations Funds through the Conversions or the direct purchase of such shares for fiduciary accounts, the beneficiaries of these accounts for which the Bank was a fiduciary have been damaged in an amount to be determined by the Court, but believed to be substantial.

## COUNT IV

## UNJUST ENRICHMENT

100.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted by all Plaintiffs on behalf of the Class and the Conversions Sub-Class. The Defendants to this Count are BAC, the Bank and the Bank Subsidiaries.

101.     By reason of causing the Bank's fiduciary assets in affected accounts to be invested in the Nations Funds, the Bank and the Bank Subsidiaries have "double dipped" as well as gained other  unjustified benefits for themselves and BAC as described above.  They have profited by the Conversions and the other sales of Nations Funds shares to fiduciary accounts as described herein, thereby unjustly enriching themselves at the expense of Plaintiffs and the members of the Class and Conversions Sub-Class.

102.     Defendants have similarly enriched themselves, their subsidiaries and affiliates by using information regarding the beneficiaries of fiduciary accounts to market through "Relationship" Managers and otherwise various goods and services including credit cards, loans and deposit accounts (and to permit certain customers of the Defendants to engage in various

54

improper practices involving the Nations Funds) from which products and services they have been unjustly enriched. The foregoing  "double dipping" was carried out by the Bank and the Bank Subsidiaries by, *inter alia*, imposing on fiduciary accounts the Bank's fees for acting as a corporate fiduciary as well as investment advisory fees, and other related charges which, when taken together with all the Nations Funds' expenses, even after so-called credits for certain Nations Funds advisory fees, exceeded the amounts to which the Bank was entitled to payment for, *inter alia*, investment of the fiduciary assets and administration of the underlying fiduciary accounts for which services its trustee or similar fees were intended to cover. Such benefits to the Bank and the Bank Subsidiaries were exacerbated by the Bank's avoidance of substantial operating expenses by reason of its abdication of its individualized investment and administrative responsibilities owed to the members of the Class.

103.    The Defendants to this Count have retained and invested the proceeds of the foregoing unjust enrichment and realized additional profits thereupon, all of which should be returned to the fiduciary accounts from which they were derived and/or their beneficiaries, as the Court shall deem appropriate and otherwise.  Missouri statutes impose strict liability against fiduciaries who "at their sole risk" make investments that are improper such that the Bank is "absolutely liable" to Plaintiff Cohen and others in the Missouri Sub-Class for their damages. (§362.550.5  R.S.Mo.).  Plaintiffs and others similarly situated are entitled to recover the Defendants' ill-gotten gains and the profits therefrom.

## COUNT V

### BREACH OF FIDUCIARY DUTY – MISSOURI STATE LAW

104.    Plaintiff Cohen repeats and realleges each and every allegation contained above as if fully set forth herein. This Count is asserted by Plaintiff Cohen for himself and the members of the Missouri Sub-Class.

105.    By acting as alleged herein, the Defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to Plaintiff Cohen and members of the Missouri Sub-Class.

106.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

107.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes to Plaintiff Cohen and the members of the Missouri Sub-Class.

108.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiff Cohen and the members of the Missouri Sub-Class to take and exercise control over their fiduciary assets for their primary benefit.

109.    The Bank and its affiliates, including the Bank Subsidiaries, have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts and/or they will continue indefinitely to extract unlawful fees and other charges from Plaintiff Cohen and members of the Missouri Sub-Class, in an amount which cannot be presently determined.

56

<u>COUNT VI</u>

<u>BREACH OF FIDUCIARY DUTY – WASHINGTON, MISSOURI, FLORIDA,</u>

<u>NEW MEXICO AND IOWA  STATE LAW</u>

110.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted by Plaintiffs for themselves and the members of the Missouri, Washington, Florida, New Mexico and Iowa Sub-Classes.

111.    By acting as alleged herein, the Defendants have violated and/or caused the Bank to violate its fiduciary duties of absolute loyalty and candor owed to Plaintiffs and the members of the respective Sub-Classes.

112.    By acting as alleged herein, the Bank has violated its fiduciary duty not to participate in transactions in which it had or has a conflict of interest and engage in self-dealing for its primary benefit, as it did and does here.

113.    By acting as alleged herein, the Bank has violated its fiduciary duties of care and productivity it owes or owed to Plaintiffs and the members of the Sub-Classes under the respective laws of the states of Washington, Florida, New Mexico, Missouri and Iowa which govern the conduct of fiduciaries such as the Bank.

114.    By acting as alleged herein, the Bank has violated its fiduciary duty that it owes or owed to Plaintiffs and the members of the Sub-Classes to take and exercise control over their fiduciary assets for their primary benefit.

115.    The Bank and its affiliates, including the Bank Subsidiaries, have already unlawfully extracted huge sums in the form of fees and other charges assessed against fiduciary accounts, and they will continue indefinitely to extract unlawful fees and other charges from members of the Sub-Classes in an amount which cannot be presently determined.

57

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request on their own behalf and on behalf of all members of the Class and the various Sub-Classes:

(a)      certification of this action as a Class Action and appointment of Plaintiffs and their counsel to represent the Class and the various Sub-Classes;

(b)      entry of judgment on the claims for breach of fiduciary duty in favor of Plaintiffs individually and as  representatives of the other members of the Class and Sub-Classes and against the Defendants and an award of compensatory damages and punitive damages in favor of Plaintiffs individually and as representatives of the other members of the Class and Sub-Classes and against the Defendants in the amount of damages caused by the Defendants' breaches of fiduciary duties;

(c)      entry of judgment enjoining the Bank from opposing any petition filed by any member of the Class  seeking the removal of the Bank as corporate fiduciary and requiring the Bank to pay for all legal fees and expenses incident thereto including its own;

(d)      entry of judgment compelling the Defendants to account for their unjust enrichment and disgorging the amount thereof (and the profits earned thereupon) to the fiduciary accounts affected by the wrongdoing described herein and/or their beneficiaries, as appropriate;

(e)      entry of judgment compelling the Bank to fully insulate its fiduciary operations from all of its other business activities and those of the other Defendants;

(f)      entry of judgment compelling the Bank to establish and implement procedures to fully protect the interests of the members of the Class including, *inter alia,* the

58

appointment of a Special Master to oversee the Bank's fiduciary operations pending completion of the other injunctive relief ordered by the Court;

(g)     repayment to the affected Nations Funds of the damages caused to them by the defendants' actions as described herein;

(h)     pre-judgment and post-judgment interest at the maximum rate allowable by law;

(i)     reasonable attorneys' fees and reimbursement of the reasonable costs and expenses of prosecuting this litigation and distributing the recovery to  members of the Class and Sub-Classes; and

(j)     such other or additional relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

April 13, 2006

GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 (Fax)

Lead Counsel for Plaintiffs and the Class

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)

59

GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800


LOCKRIDGE GRINDAL NAUEN PLLP
Richard A, Lockridge
W.Joseph Bruckner
Suite 2200
100 Washington Ave. South
Minneapolis, MN 55401
(612)339-6900

COUNSEL FOR PLAINTIFFS AND THE CLASS

## CERTIFICATE OF SERVICE

I hereby certify that on this __ day of April, 2006, I caused a copy of the foregoing to be served upon Defendants' counsel via the Court's electronic filing system to the following:

| | |
|---|---|
| Jeffery S. Russell, Esq. | Gregory B. Jordan, Esq. |
| Jason E. Maschmann, Esq. | Mary J. Hackett, Esq. |
| Bryan Cave LLP | Sharon L. Rusnak, Esq. |
| One Metropolitan Square | Reed Smith, LLP |
| 211 N. Broadway, Suite 3600 | 435 Sixth Avenue |
| St. Louis, MO 63102 | Pittsburgh, PA 15219 |

/s/ Steven M. Hamburg

413463

60