attorney fees or private settlements, and with no intention of benefiting corporation on behalf of which suit it is theoretically brought." *See*, *Shaw v. Charles Schwab & Co., Inc.*, *supra* at 1273-4 n. 2.  In no way can it be argued that this case is such a "strike suit" the statute was intended to prevent.

Plaintiffs did not file a private securities class action, but one consisting chiefly of state law claims in connection with the investment of the assets in their fiduciary accounts, including the Bank's implementation of a business decision on a nationwide basis to enhance the Defendants' income from their proprietary mutual funds. To the extent that Plaintiffs had asserted federal securities law claims in addition to the fundamental state and common law claims of breach of fiduciary duty and unjust enrichment, those claims have been withdrawn.

As recently noted by the Court in *Davis v. Kozlowski,* MDL 02-1335-PB, Civ. 04-1338-PB, 2005 WL 662694, at *2 (D. N. H. March 17, 2005) in the analysis of the "in connection with" requirement, "all of the circuit courts that have ruled on this issue, including panels of the Second, Eighth, Ninth and Eleventh Circuit Courts of Appeals, have concluded that misconduct is committed 'in connection with the sale or purchase of a security,' only if a defendant's malfeasance **has induced a class of plaintiffs to actually purchase or sell securities.**" (citations omitted, emphasis added).

Even if the Supreme Court's decision in *Dabit* would extend this holding to include "holders," because the Plaintiffs herein have no investment authority for the fiduciary accounts, the Bank's alleged malfeasance did not induce them to "hold." Moreover, the Bank is judicially estopped from claiming that Plaintiffs were owners or holders of the Nations Funds shares that were purchased by the Bank for their accounts having taken a contrary position before this orut and otherwise.

One of the few cases in the Eighth Circuit on the issue of SLUSA pre-emption is *Green v. Ameritrade*, 279 F.3d 590 (8th Cir. 2002). In that case, subscribers to an online securities price information and stock brokerage service brought breach of contract, fraud and other claims in state court, which the defendant removed to federal court.  After defendant moved to dismiss on SLUSA grounds,  the Court concluded that the case dealt with the purchase or sale of securities by plaintiffs therein, but granted plaintiffs leave to file an amended complaint. When they did so, Defendant again moved to dismiss. As plaintiffs removed all references to investment decisions to purchase or sell made by plaintiffs in reliance on the inaccurate information, the Court concluded that SLUSA did not cover the substance of plaintiffs' suit and granted plaintiffs' motion to remand. On appeal, the Court of Appeals affirmed.

The Eighth Circuit refused to extend the holding of *Blue Chip Stamps, supra*, to nonpurchasers and nonsellers of securities.  In so doing, the Court stated,

> We believe that, in enacting SLUSA, Congress did not make class actions on behalf of "nonsellers" and "nonpurchasers" removable to federal court. In enacting the Uniform Standards Act, Congress was aware of the interpretation of § 10b of the 1934 Act, which acknowledged that causes of action for the "nonpurchase" or "nonsale" of securities were not covered by the 1934 Act and that state law would fill those gaps.

As in the case here, the defendant relied on cases brought by plaintiffs who had actually bought securities in reliance on alleged representations. Under the rationale of *Green,* those cases are not determinative of the issue here. While *Dabit* may temper the *dicta* of *Green* quoted above, *Dabit* is not applicable to the facts here since a "holder" as contemplated by the Court is one who retains a security in his account and who, presumably has the power to sell but does not do so. Where, as here, the Plaintiffs have absolutely no authority over investment decisions, whether to buy, sell or hold Nations Funds shares, and since Defendants maintain that Plaintiffs "are not parties to the transaction [who can] assert securities fraud claims because they could not

have been induced into buying or selling the securities," in a like manner they cannot be deemed "holders" who hold the securities because of fraudulent information. As such, *Dabit* is inapposite.

    *4.*    ***There is Not Complete Pre-Emption***

SLUSA is also inapplicable to a complaint, such as the Complaint in this litigation, where plaintiffs have independent state and common law claims (separate and apart from the now-withdrawn federal securities law claims asserted).  The Plaintiffs are free to choose among the legal theories upon which they rely and discard others. "Where the plaintiff's claim might be brought under either federal or state law, the plaintiff is normally free to ignore the federal question and rest his claim solely on the state ground." *Federated Dep't Stores Ins. v. Moitie*, 452 U.S. 394, 406-07, 101 S. Ct. 2424, 69 L.Ed.2d 103 (1981). The choice of legal theories is a strategic choice to be made by plaintiffs, and neither the court nor the defendants are permitted to override that choice." *See, The Fair v. Kohler Die & Specialty Co*., 228 U.S., 25, 33 S. Ct. 410, 57 L. Ed. 716 (1913) (Holmes, J) (stating, "Of course, the party who brings a suit is master to decide what law he will rely on. . .").

    The Supreme Court has recognized an extraordinary and narrow exception to the well-pleaded complaint rule, where Congress **so completely pre-empts** a  particular area of law that any civil complaint raising this select group of  claims is necessarily deemed to be federal in character. *See, Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63-64 (1987).  However, the "complete pre-emption doctrine"—or, as it is sometimes called,  the "artful pleading doctrine"—applies only when

> the pre-emptive  force of [the federal statutory provision] **is so powerful as to displace  entirely** any state cause of action [addressed by the federal statute].  Any such suit is purely a creature of federal law, notwithstanding

the  fact that state law would provide a cause of action in the absence of [the federal provision].

*Franchise Tax Bd. v.  Constructive Laborers Vacation Trust*, 463 U.S. 1, 23 (1983) [emphasis added].

*See also, Gaming Corp. of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996).

Plaintiffs' remaining claims (after the withdrawal of the federal securities law claims) are based on the Bank's state and common law breaches of fiduciary duty and  Defendants' unjust enrichment. *See also, Burns v. Prudential Securities,* 116 F. Supp.2d 917, 921 (noting that courts have consistently declined to find violations of the Securities Act based on such allegations  as breach of fiduciary duty and negligence). These remaining claims are based exclusively on state and common law and Defendants must establish **complete pre-emption** in order to sustain dismissal under SLUSA.

Defendants must demonstrate that this case arises out of an area in which Congress **has expressly occupied the entire field of law so as to eliminate <u>all</u> jurisdiction** over the state and common law claims, including jurisdiction to determine whether the state and common law claims have been federally pre-empted. *See, Franchise Tax Bd., supra*. at 24; *Gaming Corp. of America v. Dorsey & Whitney*, 88 F. 3d 536, 537, 543; *Taft v. Burlington Northern R.R. Corp.,* 926 F. Supp. 866, 867-68 (D. Minn. 1996). Congress has not expressed any intent to completely or otherwise pre-empt state and common law breach of fiduciary duty and unjust enrichment claims unless those claims, as alleged, amount to an "artful" subterfuge for, in this case, state securities law claims.

There is no evidence of "clearly manifested" intent by Congress to completely pre-empt state law when, as here, SLUSA's four requirements are not met. <u>See</u> *Metropolitan Life,* 481 U.S. at 64; *Green,* 279 F.3d at 598-99; *Burns,* 116 F. Supp.2d at 920. Where allegations do not explicitly meet the criteria set forth in SLUSA, "Congress has declined to confer jurisdiction on

the federal courts, and, accordingly, the complete  pre-emption doctrine does not apply." *Id.* at

921; *see also, Green v. Ameritrade, Inc.,* 120 F. Supp.2d 795, 800 (D. Neb. 2000), *aff'd* 279 F.3d

590 (8th Cir. 2002).

Plaintiffs' Proposed Second Amended Complaint, for which they seek leave to file, is not

only devoid of allegations of violations of the federal securities laws but,  of misrepresentations

or omissions of material facts relating to a the purchase, sale or holding of Nations Funds shares

by the Bank.

**B.**     ***Plaintiffs' Breach of Fiduciary Duty Claims State a Claim for Relief Against
Defendants***

Defendants assert that as a result of state laws permitting investment of fiduciary assets in

proprietary mutual funds, **as a matter of law**, there can be no breach of a fiduciary duty by doing

so.  This is a conclusory position, unsupported by any facts.  Clearly, state laws, even those

which may permit the fiduciary to use proprietary mutual funds for the investment of the assets

in its care, do not permit a trustee, executor, guardian, etc. to breach its fiduciary duty to its

beneficiaries in making such investments.  The Bank selected the Nations Funds for the

Plaintiffs' fiduciary accounts within its control without giving consideration to the numerous

other lower-expense, better managed non-proprietary mutual funds that should have been

considered. Indeed, as alleged in the Complaint, (See Complaint at ¶¶s 39, 41, 55, 56, and 59)

the Bank proceeded with the Conversions from fee and expense free Common Trust Funds to

Nations Funds shares with advance knowledge that the expenses charged to the affected

fiduciary accounts as a result would and did escalate materially.

Plaintiffs allege such conduct, in the circumstances set forth in the Complaint, to be

breaches of fiduciary duty which, *inter alia*, unjustly enriched Defendants.  Defendants would

have this Court believe that state laws give the Bank "carte blanche" to disregard its fiduciary

duties owed to Plaintiffs and the members of the Class in the investment of assets held for their

benefit.  In making their claim that what they have done is "legal," they have failed to state how

the Bank has complied with applicable state law and, even assuming the Defendants did assert

how they complied with state law, "compliance with state law" is a question of fact inappropriate

for consideration at this time.

     As noted by one eminent trust scholar, "perhaps the most fundamental duty of a trustee

is that he must display throughout the administration of the trust complete loyalty to the interests

of the beneficiary and must exclude all selfish interest . . .."  Bogart, Trusts & Trustees 2d Ed.

Chapter 26, § 543. Although state law may permit the use of affiliated mutual funds in its

fiduciary accounts, no state law permits the Bank to violate its duties to beneficiaries through the

use of assets in its care for its own financial gain at the expense and without consideration of, the

best interests of those beneficiaries.

     Plaintiffs have alleged that the Bank, in implementing its business decision to invest

fiduciary assets across-the-board in its own proprietary mutual funds, failed to analyze each

individual fiduciary account and make any individualized investment decisions for those

accounts. The Bank failed to determine on an account-by-account basis that an investment in

mutual funds (let alone in Nations Funds mutual funds) met the needs of the beneficiaries. The

Bank failed to conduct on-going reviews to determine that Nations Funds were, on a continuing

basis, appropriate investments for each of the affected accounts and that other assets would not

perform better.  The Bank acted uniformly and, at best, made a cursory review of state law to

determine whether the use of proprietary mutual funds was prohibited in the accounts and then

left them in the account without any demonstrated periodic reviews.

In the wake of the changes in the Internal Revenue Code in 1996 which allowed conversions to be treated as tax-free transactions, the Federal Reserve Board said the following in Supervisory Letter SR 97-3 on February 26, 1997[8]:

### "Conflicts of Interest and Suitability"

In determining whether to convert common trust funds to mutual funds, **a banking organization must address the possibility that the conversion could result in conflicts between the best interests of the organization and the best interests of its fiduciary customers. The banking organization must also determine that the mutual fund shares are suitable for accounts which previously held common trust fund units.** Banking organizations that convert or transfer common trust funds to mutual funds may face questions from current and future beneficiaries with respect to these two issues.

Potential conflicts can arise if a banking organization were to charge a direct fee to the trust customer for serving as trustee while also charging an advisor's fee to the mutual fund. **Investment advisor fees are not ordinarily permitted to be charged to common trust funds, and so it may appear that the organization's primary motive for the conversion was a self-interest in generating greater fee income.** State law may preclude charging of both fees. Moreover, in cases where they are not prohibited, the organization should review its discretionary fiduciary responsibilities **for each account** in order to determine the extent to which it may mitigate the appearance of a conflict through proper disclosure and subsequent authorization by beneficiaries who have appropriate powers under the instrument.

**Another possible conflict of interest could arise from the use of *proprietary* mutual funds when there are unaffiliated mutual funds or alternate investment opportunities available that may be equally appropriate for the participant's portfolio**. Again, the appearance that the organization put its own interests above those of its fiduciary customers may cause concern particularly if investments are made in a newly-established proprietary fund with no history or track record. It is important that the organization thoroughly document its decision to transfer common trust funds into proprietary mutual funds.

The investment objectives and attributes of the organization's common trust funds that made them suitable and authorized investments do not necessarily carry over to the mutual funds that replace them. Accordingly, management must demonstrate that it has determined that the governing trust instrument for each affected customer authorized investment in mutual funds and that the mutual funds were suitable investments for the particular accounts. For certain types of

---

[8] A copy of Supervisory Letter 93-7 is attached hereto as Exhibit 2).

trust accounts, such as a conservatorship or guardianship, court approval may be required to invest in mutual funds. For other accounts, amendments to agreements or letters of direction authorizing investments in mutual funds may be necessary. Prior investment decisions that approved the purchase of common trust fund units for an account's portfolio must be reconsidered to verify suitability for all accounts about to receive mutual fund shares. Management should maintain, and examiners should review, documentation supporting the decision to invest in or hold specific mutual funds."
[emphasis added].

The Federal Reserve continues to provide supervisory guidance regarding the investment of fiduciary assets in mutual funds and potential conflicts of interest faced by Banks that do so. In 1999, the Federal Reserve published another Supervisory Letter in regard to the investment of fiduciary assets in proprietary mutual funds and potential conflicts of interest. See Supervisory Letter 99-7, attached hereto and incorporated herein as Exhibit 3. The Federal Reserve noted the existence of state laws dealing with investments in proprietary funds and indicated such laws do not exempt use of proprietary funds from adherence to fiduciary duties:

Although many states laws now explicitly authorize certain fee arrangements in conjunction with the investment of trust assets in mutual funds, **institutions nonetheless face heightened legal and compliance risks from activities in which a conflict of interest exists, particularly if fiduciary standards are not observed and documented**.

[emphasis added].

Although states have laws which permit investments in proprietary mutual funds, these laws only remove a traditional *per se* ban on the use of such investments and still require financial institutions such as the Bank to adhere to their fiduciary duties to the affected beneficiaries.  The Comptroller of the Currency has set down extensive guidelines as to the Bank's handling of fiduciary assets when investing in proprietary mutual funds to avoid breaches of fiduciary duty to trust beneficiaries.   These guidelines, as well as hornbook trust law, apply to the claims asserted in this case regardless of the terms of any trust instruments and regardless of

state law.  Obviously, if the Defendants' proffered characterizations of the state laws that they contend authorizes the Bank's *carte blanche* conduct are correct, neither the Federal Reserve nor the OCC would have deemed it necessary to make the foregoing admonitions. However, not only do these agencies put corporate fiduciaries such as the Bank on notice of the conduct required of them, but provide assistance to them in fulfilling their responsibilities.

The FDIC and OCC Trust Examination Manuals serve as guides for national banks, including the Bank, in their asset management activities, including the use of proprietary mutual funds in fiduciary accounts.  The federal government provides guidance to them in avoiding breaches of fiduciary duty, notwithstanding state laws which allow for use of proprietary funds in fiduciary accounts.   (*See e.g*. Section 3 and Section 8 of the Trust Examination Manuals attached hereto and incorporated herein as Exhibits 4 and 5.  *See also*, Appendix E  to OCC's Handbook "Conflicts of Interest," June 2000 attached hereto and incorporated herein as Exhibit 6.  As Plaintiffs have alleged, Defendants' wholesale conversion of fiduciary assets, as detailed above, followed *none* of the guidelines and implemented none of the safeguards established by the FDIC and the OCC.

Notably, Defendants do not assert that Plaintiffs have failed to allege the necessary elements of a cause of action for breach of fiduciary duty.  Rather, Defendants contend that Plaintiffs' breach of fiduciary duty claims should be dismissed because there can be no breach of fiduciary duty where, as here, the Bank and/or a co-fiduciary complied with applicable state statutes.  For the reasons above, Defendants' argument is without merit.

As Gregory B. Jordan, Esq., principal counsel for the Bank in this litigation, so eloquently stressed in an article prepared for the firm's banking clients[9], **the [state statutory] authorization to invest in captive (proprietary) mutual funds**:

> **should not be viewed as a blanket waiver of a fiduciary's duty of loyalty** in this context, but rather as a relaxation of the common law's traditional per se ban on such investments. In evaluating the prudence of such investments, **the corporate fiduciary should consider the appropriateness of mutual funds as an investment and the advantages of proprietary funds over third-party funds.  The touchstone issue is the best interests of the beneficiaries.**

[emphasis added].

Accordingly, in choosing to invest in its proprietary mutual funds, the Bank should have considered the appropriateness of mutual funds as an investment and the advantages, if any, of Nations Funds over non-proprietary, third-party funds.  To the extent the Bank failed to do so (which Plaintiffs allege it did), the Bank breached its fiduciary duty generally and its duty of loyalty in particular, to Plaintiffs and all other similarly situated beneficiaries. Inasmuch as Plaintiffs have adequately plead the necessary elements of a breach of fiduciary claim against the Bank and those other Defendants similarly culpable, Defendants' Motion should be denied.

## C.	*Plaintiffs Have Adequately Pled Their Unjust Enrichment Claim*

Under Missouri law, unjust enrichment occurs where a benefit is conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust. *Childress Painting & Assocs. v. John Q. Hammons Hotels Two, L.P.,* 106 S.W.3d 558, 562 (Mo. App. W.D.2003). The elements of unjust enrichment are: (a) a benefit conferred by one party on another; (b) appreciation by the receiving party of the fact that what was conferred was a benefit; and (c) acceptance and retention of the benefit that would render

---

[9] Gregory B. Jordan, et al., <u>Advanced Litigation Risk Management for the Corporate Fiduciary</u>, Reed Smith Library

that retention inequitable. *Id. See also, Cridlebaugh v. Putnam County State Bank of Milan* 192 S.W.3d 540, 543 (Mo. Ct. App. 2006).

Defendants do not claim that the Plaintiffs have failed to include all necessary elements for their unjust enrichment claim. Rather, Defendants assert that because the "Bank's conduct was authorized by state law," Plaintiffs cannot show, as a matter of law, that the retention of the benefits by the Bank would be "unjust." Bank's Brief at 33. Again, Defendants' statements are conclusory and whether the Bank's conduct is authorized by state law is a fact question.

Moreover, even if the use of proprietary mutual funds in fiduciary accounts is permitted by state law, the inquiry does not end there, as Plaintiffs have argued above. Plaintiffs allege that the Bank benefited at the beneficiaries' expense from receipt of fees obtained from investments in proprietary mutual funds. (See Amended Complaint at ¶ ¶ 67, 68, 69 and 70.). Further, the Complaint goes well beyond the Bank's investment in Nations Funds in setting out its breaches of fiduciary duty, which breaches the Defendants do not even address. The Complaint, describes how the Bank and the other Defendants, at the expense of Plaintiffs and its other fiduciary account beneficiaries, and in the context of the acquisition of other financial institutions, for its own benefit, minimized the services to which they were entitled and otherwise breached the fiduciary duties owed to them. Plaintiffs have alleged that the Defendants were unjustly enriched by such conduct and have amply pled such claims.

**D.     *Arbitration Of Plaintiff Cohen's Claims***

*1.     Standard For A Motion To Compel Arbitration*

Motions to compel arbitration are evaluated under the summary judgment standard set forth in Rule 56(c). *See*, *E-Time Sys., Inc. v. Voicestream Wireless Corp.*, 2002 WL 1917697, at *4 (E. D. Pa. 2002) (citing, *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.3d 51, 54 n. 9

(3rd. Cir. 1980); *Trott v. Paciolla,* 748 F.Supp. 305, 308 (E. D. Pa. 1990).  Therefore, a movant must prove through "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, . . . that there is no genuine issue as to any material fact and that [they are] entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c). The court must consider all of the non-moving party's evidence and construe all reasonable inferences in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Versage v. Township of Clinton N.J.*, 984 F.2d 1359, 1361 (3d Cir. 1993).

2.　*Arbitration Cannot Be Compelled In This Matter Because There Exists No Valid Agreement To Arbitrate*

Because the FAA is "at bottom a policy guaranteeing the enforcement of private contractual arrangements," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 625 (1985), a court must look first to whether the parties agreed to arbitrate the dispute in question, not to general policy goals, to determine the scope of the agreement.  *Id*. at 626.  While ambiguities in the language of the agreement should be resolved in favor of arbitration, *Volt Information Sciences, Inc. v. Board of Trustees, supra,* 489 U.S. at 476, a court should not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated.  "Arbitration under the [FAA] is a matter of consent, not coercion." *Id*. at 479.  A federal court must look to the relevant state law on the formation of contracts to determine whether there is a valid arbitration agreement. *First Option of Chi., Inc. v. Kaplan*, 512 U.S. 938, 944 (1995); *Alexander v. Anthony International, L.P*., 341 F.3d 256, 264 (3rd. Cir. 2003).

As the Third Circuit aptly stated in the recent case of *Bratek et al. v. Beyond Juice, LLC, et al.*, 2005 U.S. Dist. LEXIS 9992 (E. D. Pa. 2005), citing *Par-Knit Mills, Inc.*, 636 F.2d 51,54 (3d Cir. 1980):

> Before a party to a lawsuit can be ordered to arbitrate and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect. If there is any doubt as to whether such an agreement exists, the matter … should be submitted to a jury. Only when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement.

    *3.    Missouri Law Requires The Court To Determine The Validity Of Agreement To Arbitrate*

There is no question as to the requirement that in Missouri, a court is to determine the validity of an Agreement to arbitrate. In *Netco, Inc. v. Dunn*, 2005 WL 858031 (Mo. Ct. App.), the Court stated that under the FAA, a court must determine whether a valid agreement to arbitrate exists between the parties and whether the specific dispute falls within the substantive scope of that agreement." *Dunn Indus. Group, Inc. v. City of Sugarcreek,* 112 S.W.3d 421,427-28; *see Houlihan v. Offerman & Co., Inc.,* 31 F.3d 692, 694-95 (8th Cir. 1994). Whether a dispute is covered by an arbitration clause is relegated to the courts as a matter of law and is to be determined from the contract entered into by the parties. *Estate of Athon v. Conseco Fin. Servicing Corp.,* 88 S.W.3d 26, 30 (Mo.App.2002).

Consequently, "Missouri courts have held that under either the Missouri Arbitration Act or the [FAA] 'before a court may grant a party's motion to compel arbitration, it must decide whether the agreement containing the arbitration provision is valid and legally binding.'" *Estate of Burford ex rel. Bruse v. Edward D. Jones & Co., L.P.,* 83 S.W.3d 589, 592 (Mo. Ct. App. 2002) (quoting *Hitcom Corp. v. Flex Fin. Corp.,* 4 S.W.3d 618, 620 (Mo. Ct. App.1999); *Nitro Distributing, Inc. v. Dunn* L 858079, *5 -6 (Mo. Ct. App.2005)*. A recent case decided by the

Missouri Supreme Court on the subject, affirmed these principles.  *See Triarch Industries, Inc. v. Crabtree,* 158 S.W.3d 772 (Mo. banc 2005).

> 4.    *This Court Can Determine that the Arbitration Clause is Not Legally Binding under the Circumstances in the Case*

Research has revealed no Missouri case discussing the enforceability of an arbitration clause in the context of a fiduciary duty contained in an agreement relating to the management of an investment account, such as Dr. Cohen's IRA or Trusts at issue here. However, other courts addressing the issue have clearly held that such provisions are not enforceable in the context of a fiduciary relationship. In *Daly v. U.S. Bancorp Piper Jaffray, Inc.,* 110 P.3d 1057 (Montana 2005), one of twenty-three different actions against the defendant involving alleged mismanagement of accounts, a representative of defendant had spoken over the phone with plaintiff about account opening forms, advised plaintiff to sign without explaining to her that by signing the form she as agreeing to an arbitration clause. Consistent with Montana law that because of the fiduciary duty owed plaintiff by defendant, defendant was obligated to advise the investor of the arbitration clause and because she did not, the arbitration clause as not enforceable:  "Even if they had signed that clause they would have entered into a fiduciary relationship with Piper and Piper still would have had the duty of explaining the impact of the arbitration clause to them.  Therefore, in light of [precedent]. We affirm the District Court's conclusion that Piper owed a fiduciary duty to explain the arbitration provision to the Dalys, that it breached that duty, and therefore that the pre-dispute arbitration clause provisions are unenforceable."  *Id.*

In *Barrett v. McDonald Investments, Inc.*, 870 A.2d 146 (Me. 2005), the Maine Supreme Court declined to enforce an arbitration provision in an IRA custodial agreement for the reason

that the agreement was given to the investor on a take-it-or-leave it basis, and the dispute centered on advisor's advice to purchase a particular asset for his IRA account.

In *Willems v. U.S. Bancorp Piper Jaffray, Inc.,* 107 P.3d 465 (Montana 2005), as noted above, the Montana Supreme Court held an arbitration clause unenforceable on the basis of the fiduciary duty that exists between a broker and the customer.

Similarly, in Georgia, in *Harris v. Sal Financial Services, Inc.*, 606 S.E.2d 293 (Ga. 2004), the trustees of a charitable remainder trust and representative of a trust settler, brought breach of fiduciary duty action against former trustee and brokerage company.

The Supreme Court of Missouri has recently re-iterated its position on what duty is owed by a trustee in Missouri.[10]  In *Twin Chimney Homeowners Association v. J.E. Jones Construction Co.*, 168 S.W.3d 488 (E. D. Mo. 2005), the Court stated,  "[a] trustee is a fiduciary of the highest order and is required to exercise a high standard of conduct and loyalty in the administration of the Trust."  Id. at 490 (citing, *John R. Boyce Family Trust v. Snyder,* 128 S.W.3d 630, 636 (Mo. Ct. App. 2004).  In *Boyce, supra*, the failure of a trustee to fully disclose to the beneficiary all of his rights and all material facts resulted in the ability of the beneficiary to void his trustee's transaction even though there had been consent and ratification by the beneficiary.

As a consequence of the foregoing, it cannot be seriously argued that the **Bank**, as a fiduciary, had an obligation to, at a minimum, fully disclose, explain and seek the specific consent of Plaintiff Cohen to the arbitration provision before the Bank could even attempt to enforce it against his individual claims.

In *Whitney v. Alltel Communications, Inc*., 173 S.W.3d 300 (W.D. Mo. 2005), under circumstances similar to those here, the Court voided an arbitration clause on the grounds of unconscionability under Missouri contract principles. First, the Court found that the arbitration

clause defeated the ability of the consumer to pursue class action status. Wile the Bank's arbitration clause does not contains such an express prohibition, requiring a potential plaintiff to submit his claims to arbitration, as a practical matter, defeats the right of the Plaintiff to represent a class to recover for claims that would not be pursued but for the ability to obtain class treatment.   Second, the Court found that the Contract containing the arbitration clause was a contract of adhesion in that large corporations have unequal bargaining power and clients are presented with pre-printed form contracts.  The Missouri court borrowed heavily in its analysis from *Leonard v. Terminix International Co.*, 854 So.2d 570 (Ala. 2002) which found that a similar clause was unenforceable:

> This arbitration clause is unconscionable because it is a contract of adhesion that restricts the [plaintiffs] to a forum where the expense of pursuing their claim far excess the amount in controversy.  The arbitration agreement achieves this result by foreclosing [plaintiffs] from an attempt to seek practical redress through a class action and restricting them to a disproportionately expensive individual arbitration.
>
> *Id.* at 538-9.

Finally, interpretation of contract language is a matter for state law, rather than federal law. *See*, *Zink v. Merrill Lynch Pierce Fenner & Smith,* 13 F.3d 330 (10th Cir. 2003); *Stone v. Doerge,* 245 F.Supp. 2d 878 (N.D. Ill. 2002).  Under Missouri law, ambiguities in a contact are to be interpreted against the drafter. The arbitration language on which the Defendants rely is ambiguous and the claims asserted by Cohen are not covered by the arbitration agreement. Cohen's claims are for common law breach of fiduciary duty and for unjust enrichment and do not "relate to" the trust or the Trust Agreement in that his claims are independent of his contract with the Bank.

---

[10] The conduct of the Bank under its agreements with plaintiff Cohen are essentially those of trustee.

5.      *Circumstances Surrounding Dr. Cohen's Execution of the Agreements*

Plaintiff Cohen does not dispute that he signed the *form* documents proffered to him by the Bank, which documents contained so-called arbitration clauses. These documents, however, are contracts of adhesion and are insufficient to manifest plaintiff Cohen's knowing consent to the arbitration clauses therein.  The principle of "knowing consent" applies with particular force to provisions for arbitration.  *See, e.g., Specht v. Netscape Communications Corp.*, 150 F. Supp. 2d 585. 595 (S.D.N.Y. 2001), *aff'd.*, 306 F. 3d 17 (2d Cir. 2002).  A contract of adhesion is a "standard from contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer who has little choice about the terms." *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989).  BLACK'S LAW DICTIONARY, 7th Ed. 1999).

As Plaintiff Cohen's Declaration accompanying this Memorandum states, Cohen was told at the time the respective accounts were opened that these were merely "forms" which had to be signed to open the account or with regard to the Bank changing names from NationsBank to Bank of America. *See Cohen Declaration, Exhibit 7*, attached to Plaintiff's Response to Defendants' earlier motion in Reinke in May 2005 and attached hereto and incorporated herein by reference.  None of the terms were explained to him, negotiated, or discussed with any Bank representative; nor  was Plaintiff Cohen advised that he should consult with counsel regarding the documents.  *Id.*  Notably, Plaintiff Cohen was never advised that his rights as an account owner, including the right to a jury trial in the event of a dispute with the Bank, were being abridged.  *Id.*  As such, he was not knowingly aware of the arbitration agreement, but rather, understandably, assumed that he was signing routine form documents to allow the processing of the account opening.  *Id.*

Thus, notwithstanding its fiduciary obligations to plaintiff Cohen to make full and fair disclosure to him,  the Bank did not offer any explanation of these *form* documents, point out the arbitration clauses or make any disclosure as to their legal import. Id.  at ¶4.  Under the case law cited above, because the agreement was entered into in the context of a fiduciary relationship, the arbitration clause is not enforceable in this case. The arbitration clauses have no legal effect and should be disregarded or, at a minimum, be subject to an independent evidentiary hearing as to their applicability to plaintiff Cohen's claims against the Bank in these circumstances.

It should also be noted that Defendants suggest that all of Plaintiff Cohen's claims should be dismissed. Bank's Brief at p. 35.  If the Court accepts this proposition, of course, only Cohen's  claims against the Bank should be dismissed.  The dismissal would not apply to the other Plaintiff's claims against any of the Defendants.  Plaintiff Reinke's claims, and Plaintiff Cohen's claims against the other BAC are not subject to arbitration since there are no arbitration clauses that even arguably apply to disputes between these parties. *See Ctr. Physicians v. Painewebber Group,* U.S. Dist. LEXIS 22657 (May 8, 1996) ("noting that Painewebber was the only party with whom plaintiffs had an agreement to arbitrate, and questioning other defendant's request to compel arbitration); *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770; 2001 U.S. App. LEXIS 19327 (8th Cir. 2001) ("In deciding whether to stay litigation and compel arbitration under the Federal Arbitration Act, a court must first consider whether the parties have agreed to arbitrate the underlying dispute.").  One cannot be compelled to arbitrate a dispute unless he or she has agreed to do so.

In seeking to have Dr. Cohen's claims dismissed in favor of arbitration, there is no conceivable justification for arguing that the action, as a whole, should be dismissed..  As such,

the Defendants' over-broad motion to dismiss cannot even remotely extend to such parties; their

failure to address this fundamental issue speaks volumes as to the legitimacy of their motion.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied.


Respectfully submitted,

August 4, 2006


GREENFIELD & GOODMAN LLC
RICHARD D. GREENFIELD
7426 Tour Drive
Easton, Maryland
(410)745-4149
(410) 745-4158 (Fax)

Lead Counsel for Plaintiffs and the Class

SUMMERS, COMPTON, WELLS & HAMBURG
PROFESSIONAL CORPORATION

/s/ Steven M. Hamburg
STEVEN M. HAMBURG          #3313
HOLLY M. MCINTYRE          #112203
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 (Fax)


GANCEDO & NIEVES LLP
Hector G. Gancedo
Amy M. Boomhouwer
144 W. Colorado Blvd.
Pasadena, CA 91105
(626) 685-9800


LOCKRIDGE GRINDAL NAUEN PLLP
Richard A, Lockridge
W.Joseph Bruckner

Suite 2200
100 Washington Ave. South
Minneapolis, MN 55401
(612)339-6900

COUNSEL FOR PLAINTIFFS AND THE CLASS

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of August 2006, I caused a copy of the foregoing to be served upon Defendants' counsel via the Court's electronic filing system to the following:

Jeffery S. Russell, Esq.            Gregory B. Jordan, Esq.
Jason E. Maschmann, Esq.           Mary J. Hackett, Esq.
Bryan Cave LLP                     Sharon L. Rusnak, Esq.
One Metropolitan Square            Reed Smith, LLP
211 N. Broadway, Suite 3600        435 Sixth Avenue
St. Louis, MO 63102                Pittsburgh, PA 15219


Stephen M. Colangelo, Esq.         Barry Short, Esq.
MORRISON & FOERSTER LLP            LEWIS, RICE AND FINGERSH, LC
2000 Pennsylvania Avenue, N.W.     500 N. Broadway
Suite 5500                         Suite 2000
Washington, D.C. 20006             Sr. Louis MO.  63102

/s/ Steven M. Hamburg

512644